## FREDERICK SNARE CORPORATION v. MAINE–NEW HAMPSHIRE INTERSTATE BRIDGE AUTHORITY.

### No. 83.

District Court, D. New Hampshire.

Oct. 30, 1941.

On Rehearing Nov. 5, 1941.

Wyman, Starr & Booth, of Manchester, N. H., for Snare Corporation.

Sewall, Varney & Hartnett, of Dover, N. H.,. for Bridge Authority.

MORRIS, District Judge.

By concurrent acts of the New Hampshire and Maine Legislatures in 1936 and 1937 the Interstate Bridge Authority consisting of six persons, three from each state, was created for the purpose of constructing a bridge and approaches across the Piscataqua River between the City of Portsmouth and the Town of Kittery, Maine. It was constituted a body corporate to do all things necessary for the construction of said bridge with the "right to sue and be sued."

This is an action at law brought by the Frederick Snare Corporation, a corporation organized under the laws of the State of New York and having its principal place of business in New York City against the Maine-New Hampshire Interstate Bridge Authority, a corporation organized under the laws of the State of New Hampshire.

The subject matter of this litigation is a contract between the Bridge Authority and the Contractor for the construction of Unit # 1 consisting of the foundations to the bridge.,

A jury was waived and the trial proceeded before the Court.

The bridge contract is sub-divided into four separate units but we need here concern ourselves only with Unit #1 which is the one in suit.

The Bridge Authority employed a firm of engineers, Harrington and Cortelyou of Kansas City, Missouri, to draft plans to be submitted to prospective bidders. Advertisement for bids on the project was dated December 2, 1938, and announced that bids would be received in Portsmouth, N. H., on December 16, 1938. This came to the attention of the contractor on December 7, 1938, the same day that it received a letter from the Engineers that plans could be obtained from Kansas City. This advertisement states that the information for bidders, form of proposal, contract, plans and specifications, etc., "may be examined at the office of the Bridge Authority in Portsmouth, or at the office of the Engineers in Kansas City, Missouri, or obtained from either source," and it is further stated that the estimated cost of the work to be performed under these contracts is: "Unit #1, $604,600.00". In the section entitled "Information for Bidders,"

it is stated that no interpretation of the meaning of the plans will be made orally, and that every request for such interpretation must be received at Kansas City at least five days prior to the date fixed for the opening of the bids. The Snare Corporation was unable to obtain the bidding plan and contract documents until December 12, 1938.

The Snare Corporation sent two men to the site on December 9–10 for the purpose of obtaining information as to the location of the proposed bridge and such other facts as were available in the short time at their disposal but the plans were not then available for their use on the ground. There was insufficient time to make borings or to become informed as to the subsurface conditions in the river.

Figures were compiled and a bid made on the assumption of the correctness of the facts and figures shown on the plan and such other facts as were obtained by the two representatives of the contractor who visited the site. A bid was submitted to perform the work necessary for the sub-structure of the bridge for the sum of $682,076.75. December 16, 1938, the bid was accepted by the Bridge Authority and the Contractor notified.

The proposal for Unit #1 is the offer of the Contractor to do the work required by the contract documents and drawings as prepared by the Engineers, and as to Items 1 and 3 of the proposal, this offer was at a price per cubic yard for (1) mass in bases and for (3) concrete above bases in place. The place where these bases were to go was definitely located on the plan at "el rock" with the rock designated by conventional cross hatching such as commonly used by engineers.

The money for the project was to be furnished by government agencies, P. W. A., and R. F. C., and great haste was necessary because the agreement provided that the work must be started prior to December 31, 1938, or the allotment for the project would lapse.

The formal contract was not executed between the parties until January 13, 1939. The subsequent delay in the execution of the formal contract was due to the necessity for making corrections in the plans and specifications. On January 19, 1939, the Contractor was notified by letter and telegram to commence work on Unit #1 on or before January 23, 1939.

Paragraph 1 of the Contract advised the Contractor that "in case of any conflict or inconsistency between the provisions of this contract and those of the specifications, the provisions of this contract shall govern". It also advised the Contractor, Paragraph 27, that should it "encounter subsurface and/or latent conditions at the site materially differing from those shown on the plan", it may expect payment for additional work involved. Paragraph 25 expressly states that: "The plans, elsewhere enumerated herein, show in full detail all the principal parts of the project", thus the Contractor was led to believe that the plans presented a fair picture of the construction work which it was asked to undertake.

The Bridge Authority with reference to the detail of the work left all important questions to the decision of its Engineers, Harrington and Cortelyou who had a resident engineer on the job at all times. The contract called for the completion of the work by December 1, 1939, but certificate of completion was not given to the Contractor until May 8, 1940. The Bridge Authority expressed satisfaction for the job when it was completed.

Plaintiff filed a specification of its claims for extra costs for labor and material by reason of its being obliged to excavate to greater depth than was indicated on the bidding plan. It also claimed extra compensation by reason of the proximity of the old railroad bridge to the new construction. Another item in the specifications was a claim for money said to be unjustly withheld because of the failure to complete the contract on time. There was also a claim for extra costs of winter operations. These are some of the more important items in plaintiff's specifications.

Two days after the trial had been in progress plaintiff filed a count for damages alleged to have been suffered by the fraud and misrepresentations of the defendant. It is this item of fraud that I will first consider.

The representations of which the plaintiff complains are that Harrington and Cortelyou misrepresented on the bidding plan under-water surface conditions as to where ledge or rock foundation would be found; that they did not inform the Contractor that such borings as had been made were wash borings; that the Engineers did not disclose the fact that Lawrence Whittemore, a representative of the Boston & Maine Railroad had written them, in answer to their inquiry, that the railroad was "not certain" that the depths shown by the borings were "rock"; that Harrington and Cortelyou did not disclose to the Contractor that they had represented the Bridge Authority in obtaining funds from the government agencies. It is also claimed that they represented to P. W. A., and R. F. C., that this sub-structure could be built for $604,600 or less. These are the principal items of fraud relied upon by the Contractor under its amended declaration.

Early in November, 1938, the Bridge Authority engaged the Gow Division of the Raymond Concrete Pile Company to make an investigation of the subsurface conditions where the bridge was to be constructed. They made wash borings which were furnished to the Engineers Harrington and Cortelyou. The Engineers were informed by the Gow Company that the Gow borings went only to "refusal". Mr. Cortelyou testified that "refusal" might mean rock, boulder, logs, hard pan or clay. The Engineers had further tests made by Mr. Larkin, the resident engineer, and they had such information as they received from the Boston and Maine Railroad with reference to its experience in driving wooden piles for the old railroad bridge. The Engineers appear to have had no definite information which would justify them in retaining the description of "rock" at the bottom of most of the borings and the definite description of "el rock" at the bottom of the pier bases.

The bidding plan was hastily drafted from such information as the Engineers had at hand. The Contractor had no time or opportunity to check this information before making its bid and the true condition of the bed of the river was not disclosed until the work was begun.

The specifications that accompanied the bidding plan stated specifically that the Engineers did not guarantee the accuracy of the borings. It also stated that bidders must make their own investigation, but this, of course, the Contractor had no time to do. The Bridge Authority and their Engineers knew that in the limited time between the date of sending out the plan and contract and the date fixed for opening the bids, there was no opportunity for

proposed bidders to check the information contained on the bidding plan.

Plaintiff complains that the Engineers engaged by the Bridge Authority were acting in a dual capacity.

I find as a fact that Harrison and Cortelyou were employed by the Bridge Authority to negotiate with government agencies to raise money for the bridge project and that if they were successful they would be engaged as engineers in charge of construction. For the purpose of obtaining the funds they represented to P. W. A., and R. F. C., that the substructure could be built for $604,600 or less.

With such facts as the Engineers had at hand when this estimate was made I cannot find that they did not exercise their honest judgment although their estimate, in view of subsequent knowledge, appears ridiculously low. With reference to the foundations on the bottom of the river for the piers, I find that the bidding plan was quite inaccurate. There was no intention on the part of the Bridge Authority or its Engineers to purposely mislead proposed bidders or to commit any fraud upon them. The Contractor accepted the situation proceeding with the extra work and expense necessary to complete the job without complaining of any fraud on the part of the Bridge Authority or its Engineers but relying upon extra compensation in accordance with the terms of the contract.

■ The fact that Harrison and Cortelyou acted for the Bridge Authority in raising money for the project and that this fact was not disclosed to the Contractor does not appear to have any importance on the main issue of fraud but it may be of importance as characterizing decisions of the Engineers unfavorable to the Contractor during the progress of the work a matter which will be taken up later.

The amendment in the pleadings basing recovery upon the ground of fraud and misrepresentations is not established.

■ The count alleging fraud having been disposed of it remains to be determined the actual additional costs of construction to the Contractor by reason of inaccurate information as to subsurface conditions contained on the bidding plan. The Contractor's bid, of necessity, was based on such information as the bidding plan showed. It had no reason to anticipate that excavations considerably in excess of those shown on the plan would be required for the foundation of the piers. The Contractor, realizing that the additional cost of excavation and material would amount to a large sum, kept an accurate account of all costs incurred for same below the designation of ledge or rock indicated on the bidding plan by the cross hatching symbol.

The defendant does not seriously question that the Contractor was put to considerable extra expense but it does criticize the plaintiff's figures.

Following the items in the specifications in their order the first item relates to the extra cost of sinking Caisson #14 below planned elevation. Plaintiff's engineer computed the extra cost of excavation shown on the bidding plan to be 29.9 to 36.3 an extra depth of six feet plus as $13,145.62. This amount is broken down into eleven items of expense. Defendant's engineer figures the extra cost $6,500.59. In explanation of the difference he deducts the labor costs for one day which he says was consumed in clearing broken rock from the bottom of the pit which would have been necessary if no excavation had been required. This item was explained satisfactorily to the Court and I accept the plaintiff's figures with reference to the labor cost. Another important item of difference is the rental value of the equipment. The plaintiff figures a daily rental value of $784.60 based upon the value of all the equipment used on the job. Defendant's engineer figures the equipment actually used on the particular pier at the rental rates given by Snare and reached a figure of $171 for the daily rental value of that equipment. As other equipment was probably in use elsewhere on the job at the same time I am inclined to accept his figures as to the daily rental value of this equipment.

It is necessary that the foundation of the piers rest on comparatively level rock or ledge and in starting to get a foundation for Pier 14 the contractor made several borings in order to determine the surface bed of the river. The plan showed only one boring which was taken at the center of the pier. Upon investigation it was found there was a bad slope in the rock, a difference of fourteen feet in elevation from one side of the caisson to the other, which meant practically a 45 degree slope of the rock. Nearly the entire surface of

the pier had to be drilled and blasted in order to remove all the rock down to a more or less level bench to land the caisson. This had to be done under compressed air or by the pneumatic method which is very expensive. The period consumed in sinking Caisson #14 was seven days from August 4, 1939, to August 10, 1939.

After adjusting the rental of the equipment on the basis of $171 per day an allowance is made to the Contractor in the sum of $8,850.42 for sinking Pier 14 below the plan elevation.

Pier #16 was the deepest caisson that had to be sunk and the extra cost of excavation shown on the bidding plan to be 79.5 to 88.8 is $21,769.57 as computed by plaintiff's engineer. This sum is broken down in the same manner as caisson #14. Defendant's engineer figures the extra cost at $12,701.94. The difference results from a deduction of labor costs for one day and a difference in computation of the rental value for the equipment used. By the same method of computation the plaintiff is allowed for extra cost on Caisson #16 $16,860.77. The period consumed for sinking was eight days from August 22, 1939, to August 29, 1939.

Pier 17 was one of the most difficult operations on the job. Plaintiff has computed the extra cost of excavation shown on the bidding plan to be 68.3 to 77.0 as $61,127.01. This sum is broken down in the same manner as above. Defendant's engineer figures the extra cost as $22,077.-27. The time consumed in sinking caisson 17 was twenty-one days from October 12 to November 2, 1939. Much care had to be exercised in holding and sinking this caisson because of the close proximity to the supports of the railroad bridge. It required a large and additional expense in the use of extra tugs and equipment. After sinking the caisson it was found to be out of position and the cost of correcting same was tremendous.

Defendant excludes from its computation the extra cost claiming that it was one of the exigencies of the operation which the Contractor assumed. This would be true were it not for the fact that the operations were performed under great difficulty beyond the control of the Contractor.

It seems to me proper, under the circumstances, to allow the Contractor the actual expense with the same deduction for rental of equipment made in the above cases.

This results in a reduction of the total cost of caisson 17 to $48,341.41 which is allowed.

Pier 18 plaintiff has computed the extra cost of excavation shown on the bidding plan to be 63.4 to 66.6 as $13,903.09. Defendant's engineer figures the cost as $9,-506.51. The time consumed in sinking this caisson was five days from February 10, to February 15, 1940. This caisson was not as deep as 17 but conditions were almost identical except that the work was conducted in the winter time which added a great many problems and extra cost as it was right out in the channel of the river and floating ice and zero weather retarded the work. With the same reduction for rental equipment this results in a reduction of the total cost of caisson 18 to $10,835.09.

Pier 21 plaintiff has computed the extra cost as $2,118.30. Defendant's engineer claims that this is not a proper charge under the contract and that the entire amount is not chargeable to sinking but to cleaning and sealing. This matter has been explained to the satisfaction of the Court. With the same deduction for rental of equipment the extra cost of caisson 21 is allowed at $1,504.70.

Pier 23 plaintiff has computed the extra cost of excavation as $1,645.28. Defendant's engineer figures the extra cost as $1,027.52. As the Contractor has charged only $599 for rental of equipment I am inclined to let the figures stand and the full amount of $1,645.28 is allowed.

Pier 24 was constructed by the cofferdam method. Plaintiff has computed the extra cost of excavation shown on the plan to be 21 to 26.29 as $1,326.55. Defendant's engineer figures the extra cost as $929.99 which he reached by a different method of computation. As the Contractor has charged only $585 for rental of equipment the full amount of $1,326.55 is allowed.

Pier 25 was also constructed by the cofferdam method and the plaintiff has computed the extra cost of excavation shown on the bidding plan 30 to 34.05 as $2,352.21. Defendant's engineer figures the extra cost as $1,489.14. The same deduction for rental equipment results in a

reduction of the cost of Pier #5 to $1,-866.21 which is allowed.

The grand total of the Contractor's claim for extra work on the eight piers is $117,387.63. Defendant's engineer would cut this amount to $58,916.82.

I have allowed for the extra work on the eight piers $91,230.43. This sum includes $9,190.23 compensation and liability insurance and $2,746.40 social security and unemployment insurance both of which the defendant claims should be excluded as not coming within the terms of the contract.

The second item in plaintiff's specifications is a claim for "extra cost of and placing additional concrete in caissons as required to sink caissons at the site." $2414.

Defendant's engineer admits that the amounts and the prices, the unit prices charged, are substantially correct, no dispute, but he says in a letter of May 18, 1940, that "the claim is without basis of reason or without justification according to any provision of the contract." Notwithstanding this, I am going to allow the item as extra expense in the sum of $2,-414.

Item 3 of the specifications is for extra cost of operations due to undisclosed and undiscoverable proximity of the new structure to the old bridge, totalling $17,016.50 of which claim is made for an additional cost of 50% of the above which is $8,508.-25. This is based on the theory that at least fifty per cent of the total cost was due to the unusual proximity of the new structure to the old.

This item is distinct from the cost of extra excavation allowed for Pier #17 under the first item of plaintiff's specifications. The total figure of $17,016.50 is the general expense of floating the caissons into place, anchoring and sinking same. The plaintiff claims that this expense was largely increased by reason of the proximity of the new structure to the old railroad bridge and that the same was a delicate and difficult job requiring the hiring of extra tugs from Boston. It is the plaintiff's estimate that one half of the cost should be allowed because the extra cost could not be determined when the bid was made as the proper data for such determination was not shown on the bidding plan.

I cannot say that the plaintiff's estimate is unreasonable, based as it is, upon actual figures, and therefore it is allowed in the sum of $8,508.25.

Under 3(b) of the plaintiff's specifications a claim is made for $21,241.37 for "excess cost of pneumatic excavation over dredging caissons #20, 21 and 22." It is admitted that this work was done in shallow water and that subsurface conditions were known. In other words, the extra charge is predicated upon the fact that the proximity of the two bridges was not known. The only one of the three piers which had to be excavated to a greater depth than appears on the bidding plan was Pier #21 which I have considered under article 1 of the specifications. It being admitted that subsurface conditions were known from a study of the borings when the bids were made I cannot believe that all of this expense was extra and due to the fact that the piers had to be placed near the old bridge. It may have been somewhat more difficult but not to the extent of warranting $21,241.37 extra cost. This claim is disallowed.

Item 4 of the specifications is "actual cost of relocation of Boston & Maine tracks to permit clearance of piers", $1,-533.02. Counsel inform the Court that this matter has been adjusted between the parties and is no longer an issue in the case.

Item 5 of the specifications is for "money wrongfully withheld by the defendant."

The Bridge Authority has withheld an amount equal to $200 a day for 156 days, from December 1, 1939, when the contract was to be completed, to May 8, 1940, when a certificate of completion was granted. The plaintiff claims that it seasonably applied for and was entitled to extensions of time more than equal to such delay which should have been granted, viz: 34 days because of serious errors in the bidding plan; 42 days because of material differences encountered in subsurface conditions (pier 14); 42 days because of a railroad accident on September 10, 1939; 3 days because of a strike; 36 days because of material differences encountered in subsurface conditions (piers 16, 17 and 18.)

After a study of the evidence, including the letter of the Engineers to the Bridge Authority, dated December 5, 1939, I find that the Contractor is entitled to 34 days extension of time because of errors in the

bidding plan; 42 days because of material differences encountered in subsurface conditions (pier 14 and others); 23 days because of a railroad accident on September 10, 1939; 3 days because of a strike.

This amounts to 102 days. To this I will add 20 days on account of winter operations, making a total of 122 days which at the rate of $200 a day amounts to $24,400, which sum the Contractor is allowed.

The item of $51.50 on account of repair of temporary detour, is work outside the terms of the contract and is allowed.

The remaining items in specification 5 are not seriously contested. Item (c) and (e) have already been settled. Item (d) is money withheld by the Bridge Authority at the instance of the Fletcher Company against the Contractor. No lien or attachment has been made of this fund in the hands of the Bridge Authority. There seems to be no reason of longer withholding payment to the Contractor of this amount which is $3,550.88.

### Rulings of Law.

Paragraph 1 of the Contract provides among other things that: "In case of any conflict or inconsistency between the provisions of this contract and those of the Specifications, the provisions of the Contract shall govern."

Section 2, Paragraph 7 of "Information for Bidders" provides that: "Each bidder must inform himself fully of the conditions relating to the construction and labor under which the work will be performed."

Paragraph 16, provides that: "At the time of the opening of bids each bidder will be presumed to have inspected the site and to have read and to be thoroughly familiar with the Plans and Contract Documents (including all addenda). The failure or omission of any bidder to receive or examine any form, instrument or document shall in no wise relieve any bidder from any obligation in respect of his bid".

As I have already found the bidding plans were not received by the Contractor until December 12, 1938, and the bids were to be received and opened December 16, 1938. This was a contract of considerable proportions requiring accurate information of under-water conditions upon which the foundation of the bridge was to rest. The surface bed of the river could not be eas-

ily determined and as the Bridge Authority's engineers well knew would require days if not weeks of investigation.

The Engineers drafted a bidding plan for the information of prospective bidders expecting them to rely on the information therein and the Contractor's bid was based on that plan which later proved to be very inaccurate.

I find as a fact and rule as a matter of law that the Contractor is not barred by the provisions of Paragraphs 7 and 16 from receiving compensation for such extra work as it had to perform and it fairly comes within the provisions of Paragraph 27 of the Contract which provides that: "Should the Contractor encounter subsurface and/or latent conditions at the site materially differing from those shown on the Plans or indicated in the Specifications, he shall immediately give notice to the Engineer of such conditions, before they are disturbed. The Engineer shall thereupon promptly investigate the conditions, and if he finds that they materially differ from those shown on the Plans or indicated in the Specifications, he shall at once make such changes in the Plans and/or Specifications as he may find necessary, any increase or decrease of cost resulting from such changes to be adjusted in the manner provided herein for adjustments as to Extra and/or additional work and charges."

The term "Notice" as used in the contract "shall mean and include written notice". No written notice was given. Counsel for the defendant contends that because no written notice was given to the Engineers or to the Bridge Authority the Contractor is barred from recovering the cost of extra work performed.

Counsel differ as to the construction to be given the definition of "notice" in the contract. But whatever it may be, the point is too technical to work out justice between the parties. Notice is always for the protection of the parties. Writing furnishes proof. In this case the defendant had actual notice and the parties were seasonably conversant with all the facts requiring notice and no damage resulted.

The defendant objects to the allowance of the items for insurance. Paragraph 11 of the Contract requires the plaintiff Contractor to take out insurance of various kinds including liability, com-

pensation, social security and unemployment insurance. Such insurance is based upon the plaintiff's payroll and in making its bid the Contractor computed its probable payroll for performing the work in accordance with the bidding plan. It could not and did not anticipate extra payrolls for performing work not called for or anticipated because of unusual conditions not disclosed. I hold that the extra insurance should be allowed.

■ The defendant calls attention to Paragraph 17 of the Specifications which in some respects appears to be inconsistent with Paragraph 27 of the Contract.

Section 17 provides that: "Certain borings have been made by the Owner and the data therefrom available to the Engineers is shown on the plans. * * * The Owner does not guarantee such data and will not be liable for and will not pay any claim made by the Contractor because the sub-surface conditions found during construction do not correspond with conditions as indicated by the data shown. Should the Contractor consider such data insufficient he shall make such investigations as he considers necessary and shall base his bid upon his own opinion of the conditions."

Defendant's contention is that the plaintiff did not encounter latent conditions at the site materially different from those shown on the plans or indicated in the specifications; that the specifications clearly state that the data shown on the plans is not guaranteed and that the Contractor must accept the contingency of changes in foundation depths; that it, the Contractor, shall make such investigations as he considers necessary and shall base his bid upon his own opinion of the conditions.

The argument entirely ignores the fact that the Contractor did encounter subsurface conditions at the site materially different from those shown on the plans or indicated in the specifications. It disregards the fact, well known to the defendant's engineers, that no accurate soundings could be made to determine the subsurface conditions in the four days allotted between December 12, 1939, and December 16, 1939, the day the bids were opened. Defendant's engineers drafted the specifications and knew at the time that accurate information could not be obtained by bidders and that such a clause in the specifications was incapable of fulfillment. It might reasonably be applied to minor differences but should not be held to apply to such substantial differences as would constitute a fraud upon the Contractor.

I rule as a matter of law that Paragraph 27 of the Contract governs the compensation to the Contractor for extra work performed.

■ Paragraph 10 of the Contract provides that the amount of compensation to be paid the Contractor for any extra work shall be determined as follows: By unit prices as set forth in the Contract or if no such unit prices are set forth by a lump sum mutually agreed upon by the Owner and the Contractor or "If no such unit prices are so set forth and if the parties cannot agree upon unit prices or a lump sum then by the actual net cost in money to the Contractor of the materials and of the wages of applied labor including insurance and rental."

The fact should be kept in mind that extra excavation was found necessary and desirable and that the foundation of every pier had to be inspected and authorized by the resident engineer. Under the circumstances I find and rule that compensation for the extra work done by the Contractor should be computed on a basis of actual expense as kept at the time the work was performed.

■ Section 10 read in connection with paragraph 11 and 21, requiring payments to be made on the certificate of the Engineers appears to make the Engineers the arbiters of questions relating to extra compensation or any disputes which may arise between the Owner and the Contractor. Upon this theory the Contractor would not be able to receive compensation for extra cost except on certificate of the Engineers. The Engineers were not in a position to exercise unbiased judgment. They were acting in a dual capacity. They were the promotors of the entire project acting for the Bridge Authority in obtaining funds for the construction of the bridge. They had represented to the R. F. C., and the P. W. A., that the bridge could be built for $604,600, and had an interest in keeping the cost at or below that figure. Such an interest would bar them from sitting as a juror in any civil case. The case of Kemp v. Rose, 1

Gif. 258, seems to be exactly in point and well illustrates the position of the Engineers in the present case.

I cannot accept the decision of the Engineers in any matter of difference arising between the Frederick Snare Corporation and the Bridge Authority. In any such matters I have found the facts as the evidence appears to warrant and have not accepted the judgment of the Engineers.

I find nothing in the Contract as construed by me to bar the Contractor from recovering the cost of such extra labor as the Court has allowed for the completion of its contract.

I find a verdict for the Contractor in the sum of $130,155.06 with interest from the date of the writ and costs.

#### Amended Opinion on Rehearing.

This action came on for rehearing November 5, 1941, for further consideration of various items of allowance made in the original opinion filed October 30, 1941.

It was argued by counsel for the parties and after due consideration I find that a further allowance should be made under Section 10 of the Contract of $5,964.10 which added to the original verdict amounts to $136,119.16.

The final order is, Verdict for the plaintiff in the sum of $136,119.16 with interest from the date of the writ and costs.