**FOSTER CONSTRUCTION C. A. AND WILLIAMS BROTHERS COMPANY,**
a Joint Venture, etc.

v.

**The UNITED STATES.**

No. 417–66.

United States Court of Claims.

Dec. 11, 1970.

James T. Lewis, Washington, D. C., attorney of record, for plaintiff. Hudson & Creyke, Washington, D. C., of counsel.

Edward J. Friedlander, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case was referred to Trial Commissioner David Schwartz with directions to prepare and file his opinion on the issues of plaintiff's motion and defendant's cross-motion for summary judgment under the order of reference and Rule 166(c). The Commissioner has done so in an opinion and report filed on March 25, 1970. Defendant filed a request for review by the court, plaintiff urged the court to adopt the commis-

sioner's opinion and the case has been submitted to the court on oral argument of counsel and the briefs of the parties.

The court agrees with the trial commissioner's conclusions, his recommended disposition, his discussion of the general principles of law applicable to this type of case, and the reasoning of his opinion, except that the court finds it unnecessary to consider whether the particular boring logs in this case indicated conditions other than those actually encountered.

■■ The reason why the court need not pass upon the correctness of the commissioner's discussion of this problem (in the parts of his opinion headed "The indications in the logs, on their face", "The Board's decision on the logs as permissible indicators of the subsurface", and "The alluvial condition and its discoverability on a minimum site examination") is that the court is of the view that the other indications in the contract of an impermeable subsurface permitting excavation in the dry—the notation as to the types of concrete; the direction that "all concrete shall be placed in the dry"; the omission from the concrete provisions of the documents of any provision for a concrete seal or for a class of concrete of which seals are made; and the so-called "6 tons" note—are sufficient in themselves, without the logs, to sustain the determination that a changed condition was encountered. While the commissioner characterizes these indications as "confirmatory" (in view of his reliance on the logs), the court believes that these features, taken together, supply an independent basis to sustain plaintiff's claim. The first category of changed conditions in the Changed Conditions Clause refers to conditions materially different from those "indicated in this contract", and the design features to which we have referred reasonably "indicate" the type of subsurface conditions expected to be encountered. For this part of the Changed Conditions Clause to apply, it is not necessary that the "in-dications" in the contract be explicit or specific; all that is required is that there be enough of an indication on the face of the contract documents for a bidder reasonably not to expect "subsurface or latent physical conditions at the site differing materially from those indicated in this contract." In this instance, as Commissioner Schwartz well points out, the design features mentioned above performed that function and could very well lead a reasonable bidder to conclude that he would not meet the type of subsurface conditions plaintiff actually met during performance.

On this basis, the court by-passes the issue of whether the logs were another such "indication", without agreeing or disagreeing with the trial commissioner's opinion on this point, and treats the case, for the purposes of decision, as if there had been no boring logs at all. The other indications, all of which present purely legal questions unmixed with factual issues, are enough to dispose of the changed conditions problem favorably to plaintiff.

As supplemented and qualified by the foregoing discussion, the court agrees with the trial commissioner's opinion (without adopting or rejecting his discussion of the particular logs in this case) and his recommended conclusions as hereinafter set forth, and hereby adopts the same as its basis for judgment in this case. Therefore, plaintiff is entitled to recover in accord with and to the extent of the conclusion set forth hereinafter.

## OPINION OF COMMISSIONER

SCHWARTZ, Commissioner: Plaintiff sues for $1,417,923 for changed conditions and changes, under a standard government construction contract dated June 18, 1956 with the Bureau of Public Roads of the Department of Commerce for the construction of a bridge over the Terraba River in Costa Rica.

The contract provided for the construction of a 56-mile stretch of road of

the Inter-American Highway, of which the bridge was a part. The total contract fixed price was $9,607,185; the portion for the bridge was $1,087,560. Plaintiff, a joint venture composed of Foster Construction, C.A., and Williams Brothers Company, was the successful bidder; it subcontracted the bridge for $936,838 to another joint venture known as Caribbean-Macomber-Brunzell, for whose benefit the suit is brought. Both contractor and subcontractor will herein be referred to as the plaintiff or the contractor, except as may otherwise be required.

In a proceeding under the disputes clause in the contract, the claims have with minor exceptions been denied by the contracting officer and, on appeal, by the Department of Commerce Appeals Board. This suit followed, and the parties have now made cross-motions for summary judgment, whose disposition requires review of the decision of the Appeals Board, pursuant to the standards of the Wunderlich Act, 41 U.S.C. §§ 321–322. Plaintiff contends that the Board committed errors of law and made findings of fact unsupported by substantial evidence, within the meaning of the Act.

All but one of the claims are herein upheld and the decision of the Board is reversed. The determination of damages was in the administrative proceedings postponed to the determination of liability. In accordance with United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966), therefore, proceedings are suspended to give the parties the opportunity to obtain an administrative determination of the amount of the equitable adjustment to which plaintiff is entitled.

## I.

### The Claim of Changed Conditions at Piers 4, 5 and 6

Clause 4 of the contract, the standard changed conditions clause, authorizes claims for two types of changed conditions, often called category one and category two: "(1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract." [1] (The full text of clause 4 is set out in an appendix, together with the other contract provisions to which reference will be made.) Plaintiff claims that it encountered both types of changed conditions. Because the claim of category one changed conditions is herein upheld, it will not be necessary to discuss the validity of the claim of category two changed conditions.

The controversy centers on the excavation of the cofferdams for the foundations of piers 4, 5 and 6 of the six piers of the bridge. Piers 1, 2 and 3 were constructed without serious trouble. They were on the north, shallow side of the river, which remained dry except at the height of the rainy season. The riverbed sloped downward from the north bank to the deepest part of the channel, between pier 6 and abutment 2 on the south bank. Accordingly, piers 4, 5 and 6 were designed to be larger in size, deeper in the elevation of their footings and wider apart than piers 1, 2 and 3.

Drill hole logs and design details and directions attached to the contract, plaintiff contends, indicated that the sub-

---

1. The Government has not before the Board and in this court urged, as the contracting officer held, that the text of category one of the clause has been amended by Article 4.2 (text in appendix) of the 1941 edition of the Bureau's Specifications for Construction of Roads and Bridges, known as FP–41, referred to in the contract documents. It is therefore assumed that the governing text of the changed conditions clause is that found in clause 4 as it reads in the General Provisions attached to the contract, set out in the appendix.

surface at the sites of piers 4, 5 and 6 would be firm and stable, with a 6-ton per square foot bearing capacity at the footings, and relatively impermeable, that is, impervious or resistant to the flow of water, to such degree as would allow the dewatering of the cofferdam by pumping and thereby permit excavation "in the dry." Further, plaintiff contends that the subsurface conditions encountered were materially different in that the materials were soft, not firm, and unstable, without the expected bearing capacity, and highly permeable. These changed conditions, it is contended, caused a "quick" condition, in which loose and permeable materials gave no firm hold for the sheet piling, and water in great quantities entered the cofferdams, leading to great difficulties in excavation, including losses of cofferdams, and, at piers 5 and 6, made it impracticable to dewater the cofferdam by pumping and thus impossible to excavate in the dry.

It is further claimed that the Bureau acknowledged the existence of changed conditions in a series of change orders, in which the conditions encountered were met by a redesign of the foundations, lifting their elevations and providing for steel bearing piles under the foundation of pier 4 and the pouring of concrete seals at the bottom of the cofferdams for piers 5 and 6. Plaintiff was, of course, paid for the piles and the seals. The claim is for other costs incurred by reason of the alleged changed conditions.

The defense, a reliance on the decision of the Board denying the claims, will be discussed below.

Intimately involved in the claims are the processes termed excavation "in the wet" and "in the dry" of cofferdams, and the pouring of concrete for pier foundations "in the wet" and "in the dry." The cofferdams for the pier foundations were constructed by driving interlocking steel pile sheeting into the riverbed to form a square, and then excavating within the walls created by the piles. Excavation "in the wet" refers to a procedure by which the excavation takes place underwater and no effort is made to lower the level of the water, within the cofferdam, below the level of the surrounding river. Where, as was the case here, depths of 50 feet were involved, and rocks were expected and encountered, excavation in the wet presents difficulties beyond the inevitable costs and safety problems. Divers must work at substantial depths in murky water and cannot see clearly how to handle the rocks which must be removed from below the piles as they are being driven downwards.

In excavation "in the dry," as the excavation proceeds, pumping gradually lowers the water within the cofferdam to a workable level, somewhat above the bottom of the excavation. No effort is made to pump out all the water; "in the dry" does not mean literally dry. Divers, if any are used, operate only in shallow water, and it is easy to deal with rocks under the piles.

Cofferdam piling is not watertight. Water seeps in between the piles, through holes left by rocks removed from below the piles as they are driven, and particularly through the earth at the foot of the excavation. Pumping out or "dewatering" of a cofferdam becomes impracticable if water flows in faster than it can be pumped out. Where this occurs, excavation must take place "in the wet."

Plaintiff was able, defendant recognizes in its briefs, to dewater the cofferdams at piers 1, 2 and 3 sufficiently to excavate in the dry. At pier 4, after the piles were driven, excavation in the dry was accomplished by techniques not involved in the case. At piers 5 and 6, however, excessive water prevented excavation in the dry.

Pouring of concrete, also, may take place "in the wet" and "in the dry." Concrete is poured in the dry when it is poured into a dewatered cofferdam. When excessive water in a cofferdam has prevented dewatering, pouring in the dry is impossible. The solution is to plug the bottom of the cofferdam with a seal made of a special grade of con-

crete, known as "S" or tremie concrete, resistant to being washed away by water. The word "tremie" signifies the method of pouring it, underwater. Pouring tremie concrete for a seal is called pouring in the wet. After the seal stops up the bottom of the excavation, the cofferdam can be pumped out, and the standard grade of concrete for the footing proper is poured in the dry. Standard concrete would wash away if poured in the wet; it can be poured only in the dry. When the standard concrete is poured on top of the seal, both become part of the foundation.

## A. The Conditions Encountered

Since proof of the case requires that the conditions encountered must differ materially from those indicated in the contract, the first issue may appropriately be whether excess water and unstable soils were encountered as claimed. Under the Wunderlich Act, the court would be bound by findings by the Board, supported by substantial evidence, of the facts of the conditions encountered. United Contractors v. United States, 368 F.2d 585, 594, 177 Ct.Cl. 151, 160 (1966). Such findings were not made, although the Board said that it was favorably impressed with testimony that the materials encountered were "quite permeable—would permit the passage of as much water as was available." The evidence in the record, however, is that plaintiff did encounter excessive water and unstable materials, as claimed.

The excavation through the cofferdam at pier 4 early encountered "quick" or loose materials, consisting of soft sand. Plaintiff's log of operations speaks of soil acting like quicksand, with the water pressure from the bottom bringing the water up. The Bureau's district engineer described the soil as "very loose, non-compact, sand, gravel and small boulders with a low bearing value." There followed "boils" and finally a "blow" or "blow-in," that is, progressively greater inrushes of water through loose, non-cohesive soil around and at the foot of the cofferdam. The suction created by the blow drew out such water as was then in the excavation for pier 3, 90 feet away.

The Bureau thereupon ordered the work suspended and an exploratory hole drilled in the excavation. The log of this hole showed "loose," "soft," "very loose" and "fairly soft" materials of plainly insufficient bearing capacity, to a depth of more than 30 feet below the proposed elevation of the footing on the plans. Accordingly, the design of the foundation was revised, in Change Order No. 10, by the addition of steel bearing piles under the footing. The Description and Reason for Change Order, attached to Change Order No. 10, states:

> While excavating for the foundation of Pier No. 4 of the Terraba River bridge an unstable foundation condition was encountered at elevation 6.0 ft. Due to the excessive amount of water and material running into the hole at this elevation the contractor stopped work at this location. A test hole was drilled in the bottom of the excavation and three timber test piles were driven. Data from these operations indicated that steel bearing piles would be necessary for this foundation. For the above reasons the footing design for this pier had to be revised.

The order establishes that at pier 4 plaintiff encountered "an unstable foundation condition" and an "excessive amount of water."

At pier 5, excessive water caused various difficulties and finally became more than pumps could contend with, requiring the abandonment of excavation in the dry. Excavation was completed in the wet. At a point above the plan grade of the footing, the excavation encountered a layer of clay, which the designer of the bridge testified was objectionable for its low bearing capacity, and which a plaintiff's witness estimated had a bearing capacity of 2 tons per square foot. The Bureau directed that the layer be removed, to a distance of 5 feet below plan grade, and the space backfilled.

At the planned elevation of the footing, the Bureau directed that a concrete seal be poured to plug the bottom of the excavation. The Description and Reason for Change Order No. 17 describes what happened as follows:

At approximate elevation plus 15 ft. of Pier No. 5 of the Terraba River Bridge it became impracticable to cope with the excessive amount of water entering the cofferdam by pumping. Three-eight inch and five-six inch pumps would not hold the water down low enough so the contractor could carry on the excavation in the dry. When this condition developed the contractor pulled his pumps and continued excavation in the wet to plan elevation.

Due to the impracticability of pumping this excavation dry and placing concrete in the dry it is considered necessary to order a concrete seal placed.

Since there is no item for Class "S" (Seal) concrete in the contract it was necessary to negotiate a price for it.

On the basis of the experience at pier 5, plaintiff requested two additional test borings at pier 6, and the Bureau drilled two holes, 36 and 34 feet to the north and south of the proposed foundation of pier 6. The logs of these holes showed subsurface materials characterized by "seepage zones" and low bearing pressures. The Bureau's district engineer wrote in a memorandum that "the conditions shown by these two new borings differ from those shown on the plans," and required the "restudy" of the design of the footings. The redesign of pier 6 is explained in the Description and Reason for Change Order No. 22:

Based on the results of further test drilling at Pier No. 6 of the Terraba River Bridge, which indicated a 5 ft. layer of clay at about El. −10.0 ft. or 5 ft. under the elevation of the foundation, it has been decided by our Division Design Office to raise the foundation grade from El. −4.78 ft. to El. −0.04 ft. to take advantage of the firm material between elevations −0.04 ft. and −10.0 ft.

Experience in Pier No. 5 of this same bridge, which was constructed in the same type of material found at Pier No. 6, has proven that it is impracticable to cope with the excessive amount of water entering the cofferdam by pumping, therefore it is considered necessary to order a 14 ft. seal of class "S" concrete placed at El. −0.04 ft.

The quoted orders establish excessive water at piers 5 and 6. The orders and other evidence estabish, also, unstable materials of low bearing pressures at both piers. The statement, in the order, that the subsurface at pier 5 was composed of the same type of material as at pier 6, makes the evidence of low bearing pressure materials at each, applicable to the other. Instability of the subsurface at both piers appears, also, from the fact that the seals ordered at both piers, though primarily intended to overcome the excessive water, were also intended to provide needed bearing strength. A Bureau memorandum directed that the seal at pier 6 should be made as big as the inside dimensions of the cofferdam in process of construction, and cautioned against any such "kicking in" of the bottom dimensions of the cofferdam as had caused the loss of "some bearing area of the seal constructed at Pier 5." The district engineer wrote to plaintiff that the seal was being made so big "to obtain an increased bearing area."

All the evidence shows that excessive water and unstable soils were encountered at each of piers 4, 5 and 6, and there is no contrary evidence of any substance. To the extent, therefore, that findings were not made by the Board, they may be supplied, and such findings are now made. Maxwell Dynamometer Co. et al. v. United States, 386 F.2d 855, 870, 181 Ct.Cl. 607, 631 (1967); Koppers Co. v. United States, 405 F.2d 554, 558–559, 186 Ct.Cl. 142, 147–151 (1968); Vann v. United States,

420 F.2d 968, 981, 190 Ct.Cl. 546, 569 (1970).

B. *The Conditions Indicated in the Contract*

Beyond the issue of fact as to the conditions encountered, there is the issue of what subsurface conditions were, in the words of the changed conditions clause, "indicated in this contract."

Two types of data in the contract, logs of drill holes and design directions and details, are relied upon as indications that the subsurface to be encountered would be impermeable to such degree as would permit excavation in the dry, without the use of a seal, and would be firm and stable, with a 6-ton bearing capacity at planned grade of the proposed pier foundations.

The logs are a claimed source of indications of both impermeability and stability. One set of design details is said to confirm the indications of impermeability in the logs and also to contain an indication that the impermeability would be such as would permit excavation in the dry, without the use of a seal. Another design detail is said to confirm the logs' indications of stability and to add an indication of soils of 6-ton bearing capacity at the planned elevations of the pier foundations.

■ 1. *Legal standards for decision.* Decision on the claimed contract indications is a matter of the analysis and interpretation of the contract documents, and thus presents a question of law to be decided by the court independently of the decision of the Board. United Contractors v. United States, *supra,* 368 F.2d at 596 n. 5, 603, 177 Ct. Cl. at 162 n. 5, 173–174; Ray D. Bolander Co. v. United States, 186 Ct.Cl. 398, 411, 415–416 (1968).

■ The Government urges that the question becomes one of fact because it involves the operation of the minds of the plaintiff's agents in interpreting the agreement or the reasonableness of the inferences drawn by them from the agreement. The construction of a contract, however, includes the determination of the intention ascribed to the parties in using particular words and the meaning one party may reasonably give to the words proposed for insertion by the other (Dynamics Corp. of America v. United States, 389 F.2d 424, 429, 182 Ct.Cl. 62, 72 (1968)), as well as the correct standards for the application of contract language (Perini Corp. v. United States, 381 F.2d 403, 409, 415, 180 Ct. Cl. 768, 777–778, 788 (1967); National Steel and Shipbuilding Co. v. United States, 419 F.2d 863, 873–874, 190 Ct.Cl. 247, 263–265, (1969)). Whether the Board made any "subsidiary" findings of fact which, the Government lastly urges, are entitled to finality, depends on whether the facts so found were "simple facts" (Perini Corp. v. United States, *supra,* 381 F.2d at 409, 180 Ct.Cl. at 777), and is a matter for consideration in connection with any such findings.

The standard to which plaintiff is held in proving contract indications of subsurface conditions, the Board held, is that of misrepresentation by the Government. On a review of the opposing testimony, largely by expert witnesses, the Board concluded that plaintiff "fell very far short" of meeting the burden of proving "by a preponderance of credible evidence" that the Bureau had misrepresented the jobsite conditions.

■ The appropriate standards for a category one changed conditions claim are otherwise. The issue of the indications in the contract is one of law for decision by the tribunal, not an issue of fact to be proven by a preponderance of expert testimony and to be decided on the basis of a failure of the plaintiff to meet a burden of proof. The standards for decision are not those for determining Government misrepresentation, but rather the standards appropriate in the construction of contract language and particularly the changed conditions clause in the light of its underlying policy.

■ In misrepresentation, the wrong consists of misleading the contractor by a knowingly or negligently untrue repre-

sentation of fact or a failure to disclose where a duty requires disclosure. Flippin Materials Co. v. United States, 312 F.2d 408, 410–413, 160 Ct.Cl. 357, 359–365 (1963); Morrison-Knudsen Co. v. United States, 345 F.2d 535, 539, 170 Ct.Cl. 712, 718–719 (1965). The claim may be proven, where it is based on a breach of a duty to disclose, though the contract is silent on the nature of the subsurface to be encountered, and in any type of case though the contract contains no changed conditions clause. Some degree of Government culpability—either untruth or such error as is the legal equivalent—must, however, be shown, and the plaintiff's burden of proof is not satisfied merely by proof of a variation between the subsurface conditions as stated in the contract and as encountered. Midland Land & Improvement Co. v. United States, 58 Ct.Cl. 671, 683–684 (1923), aff'd 270 U.S. 251, 46 S.Ct. 218, 70 L.Ed. 570 (1926); C. W. Blakeslee & Sons v. United States, 89 Ct.Cl. 226, 250–251 (1939), cert. denied, 309 U.S. 659, 60 S.Ct. 512, 84 L.Ed. 1007 (1940).

The claim based upon the modern changed conditions clause is very much different, though it may arise from the same facts and be joined with a claim for misrepresentation. E. g., J. A. Terteling & Sons v. United States, 390 F.2d 926, 927, 182 Ct.Cl. 691, 694 (1968). See Gaskins, Changed Conditions and Misrepresentation Under Government Contracts, in Changes and Changed Conditions, Government Contracts Monograph 3 (1962) 14, 22–23. Misrepresentation is not the issue. While the predecessors of the modern changed conditions clause spoke of "misrepresented conditions," those words were dropped long before the adoption in 1953 of the version of the clause found in the present contract. State Bar of Calif. Comm. on Continuing Education of the Bar, Government Contracts Practice § 14.72 (1964). In the modern version of the clause, " * * * a finding that the contractor was actively 'misled', in the sense that the Government 'withheld' or 'concealed' informa-

tion within its grasp, is not essential to proof of a changed condition. * * * Fault on the part of the Government is not a necessary element." United Contractors v. United States, supra, 368 F.2d at 597 n. 6, 177 Ct.Cl. at 165 n. 6 (1966), and cases cited. See Kendall, Changed Conditions as Misrepresentation in Government Construction Contracts, 35 Geo.Wash.L.Rev. 978, 978–82 (1967).

A changed conditions claim, so far as the contract is concerned, is entirely dependent on what is "indicated" in the contents of the contract documents. On the one hand, a contract silent on subsurface conditions cannot support a changed conditions claim, as it could a claim for misrepresentation. Ragonese v. United States, 120 F.Supp. 768, 769, 128 Ct.Cl. 156, 159 (1954). On the other hand, nothing beyond contract indications need be proven. "The first portion of Article 4 requires only that actual conditions encountered 'materially differ' from those shown or indicated on the plans or specifications." United Contractors v. United States, supra, 368 F.2d at 597 n. 6, 177 Ct.Cl. at 165 n. 6.

The causes of an erroneous indication in the contract—whether simple error, negligence or other—are no longer important. An "indication" may be proven, moreover, by inferences and implications which need not meet the test for a "misrepresentation" or "representation," concepts which have a long common law history associated with fraud. In thus ending the need to prove Government fault and limiting the issues to the indications in the contract, a matter of law for decision for the court, the changed conditions clause eliminates the factual elements of misrepresentation and any need to impose a burden on plaintiff to prove those elements.

The claimed contract indications will be considered in the light of the foregoing formulation of the issue and the appropriate standards for its decision.

2. *The indications in the logs, on their face.* The drawings attached to the contract documents, the answer ad-

mits, "conveyed certain information regarding the nature of subsurface conditions to be encountered" during excavation for the pier foundations, in the form of "logs of the drill holes" of "exploratory drillings * * * conducted by the Bureau of Public Roads in order to determine the subsurface conditions." The data consisted, as is customary, of profile drawings of the contents of the holes and accompanying legends.

All the holes were drilled on the center line of the 1100-foot length of the bridge, which was composed of four spans, each 90 feet long, separating abutment 1 and piers 1, 2, 3 and 4, and three spans, each 250 feet long, separating piers 4, 5, 6 and abutment 2. Plaintiff relies on drill holes 1, 2, 3 and 4. Drill hole 1 was located almost at Pier 2. Drill hole 2 was between Piers 3 and 4, 30 feet south of Pier 3 and 60 feet north of Pier 4. Drill hole 3 was between Piers 4 and 5, 190 feet south of Pier 4 and 60 feet north of Pier 5. Drill hole 4 was between Piers 5 and 6, 190 feet south of Pier 5 and 60 feet north of Pier 6.

The logs of the four holes showed three types of materials: a surface layer, in each hole, of type 2, "sand and gravel, loose," and below, only two types of material, both apparently firm and stable and containing clay mixtures; type 3, "sandy clay with few boulders firm," and type 4, "boulders, voids filled with sand and clay."

The presence of "boulders," with "filled" voids of sand and clay, and "firm" sandy clay with few boulders is said to indicate firm and stable materials, and the character of both of these materials as clay mixtures is said to indicate that the subsurface would be relatively impermeable. Only the second of these propositions requires explanation. As amateur gardeners know, the presence of clay tends to make soil impermeable. It is elementary soils learning that clay molecules are cohesive and bind the soil together to resist the flow of water, to the point that clay-type materials may be virtually impermeable. On the other hand, granular materials, such as sand, lack the molecular attraction of clay and are held together only by the friction of their touching particles. Any water pressure destroys their contact and the material becomes "quick," that is, freely permeable. "All materials," said the soils engineer who testified as a Government expert, "can become quick to some degree with the exception of clay materials."

The approximate thickness of the layers in feet was:

| Material | Hole 1 | Material | Hole 2 | Material | Hole 3 | Material | Hole 4 |
|---|---|---|---|---|---|---|---|
| 2 | 24′ | 2 | 22′ | 2 | 15′ | 2 | 6′ |
| 4 | 16′ | 4 | 21′ | 3 | 6′ | 3 | 15′ |
| 3 | 2′ | | | 4 | 24′ | 4 | 38′ |
| 4 | 14′ | | | | | 3 | 22′ |

The pattern of the four logs suggests strata running across the river. A surface layer of sand and gravel is found in each hole, and as the riverbed slopes downward from hole 1 to hole 4, the surface layers narrow, from 24 to 22 to 15 to 6 feet, in conformity with the descent of the riverbed shown by the elevation of the tops of the holes, from elevation +54 to +52 to +45 to +40.

Immediately beneath the surface layer in holes 1 and 2, and beneath relatively small layers of type 3 material in holes 3 and 4, each hole has a substantial layer of type 4 material—16, 21, 24 and 38 feet deep, a gradual thickening suggestive of a cross-river stratum. The elevations of the tops of these layers, +30, +30, +24 and +19, seem to descend in conformity with the riverbed.

No contra-indications come from the distance of the logs from the pier sites. Only interpolation is required for the application of the logs to the site of pier 4, which is bracketed by drill holes 2 and 3, and to the site of pier 5, which is bracketed by drill holes 3 and 4. Pier 6 is not similarly bracketed. Drill hole 4 is 60 feet north of the site of pier 6. (Hole 5, 125 feet to the south of pier 6, higher on the ascending riverbed and relatively shallow, is not relied upon by plaintiff.) Extrapolation of the hole 4 data to pier 6 is warranted by the stratification indicated in holes 1 through 4 and the 38-foot layer of type 4 material in hole 4. The regular distances between the pier sites and the drill holes suggest, moreover, that the designer made just such interpolation and extrapolation from the drill holes to the proposed pier sites as plaintiff relies upon. Both interpolation and extrapolation were reasonable.

On their face, therefore, the logs give readily discernible, strong and therefore entirely reasonable indications, within the meaning of the changed conditions clause, that relatively impermeable and stable and firm materials would be encountered in excavating for piers 4, 5 and 6.

3. *The Board's decision on the logs as permissible indicators of the subsurface.* The Board held the logs impermissible indicators of subsurface conditions at the sites of piers 4, 5 and 6, on the ground that logs of drill holes as distant as these from the pier sites were not intended to reflect, and should not be read as reflecting, the nature of the subsurface, in an alluvial riverbed. The alluvial condition of the riverbed, the Board held, was discoverable by plaintiff on a minimum examination of the site.

The Board's rationale, while not expressed in findings or conclusions, can be gathered from its descriptions of the conflicting expert testimony. It stated that the Government's experts, whose tesimony it said it preferred, testified that "the boring information was more

or less obviously subject to almost constant variation on account of the known turbulence of the river and the alluvium or changing nature of its bed," and that "the conditions encountered were to no degree abnormal, taking into account the general characteristics of the job situation apparent from even a routine and more or less minimum site examination of the surrounding area, the river, its banks and bed." The Board criticized the plaintiff's witnesses for interpreting the logs as indicating conditions at the pier sites, some distance away. Such an interpretation, the Board said, rested on the "doubtful" assumption that "the boring data relating to locations some distance away were intended to and did reflect in exact and full detail conditions at the pier locations." In making this assumption, the Board said, the witnesses were "taking no account of inevitable variations in such situations generally and the fairly obvious changing characteristics and impact on subsurface soil conditions of a turbulent river and river bed of an alluvial nature as here involved."

In the last analysis, the Board rejected the logs because of the failure of the plaintiff to perform the required site investigation, on which, the Board held, the alluvial condition of the riverbed would have been apparent. While the Board did not cite specific contract provisions for site investigation, it spoke of "the separate contract requirements for site examination and reasonable investigation of all the contract conditions," apparently a reference to Article 2.3 of specifications FP–41 (see note 1, above). The Article (text in appendix) requires the bidder "to examine carefully the site of the project contemplated" and provides that submission of a bid shall be prima facie evidence that "the bidder has made such examination and is satisfied as to the conditions to be encountered in performing the work as scheduled." The Board did not mention or paraphrase the Instructions to Bidders, Standard Form 22, which the bid

schedule directed bidders to read carefully and which states:

> 2. *Conditions at Site of Work.* Bidders should visit the site to ascertain pertinent local conditions readily determined by inspection and inquiry, such as the location, accessibility and general character of the site, labor conditions, the character and extent of existing work within or adjacent thereto, and any other work being performed thereon.

The Board's references to the requirements for site examination were made in the course of its disposition of the Government's arguments based upon the note in the contract plans disclaiming governmental responsibility for the logs. The note reads as follows: "Note: Drill Hole Data shown for information only. The Bureau of Public Roads does not assume responsibility for the accuracy of the data."

The Board did not accept the Government's contention (not raised in this court) that the disclaimer absolved it of all responsibility for the logs. The disclaimer, the Board held, does not entitle the contractor to read more into the contract data than appears or relieve him of his responsibility for judging the data properly and for complying with the contract requirements for site examination and "investigation of all the contract conditions." It is "a desirable cautionary observation or reminder to the contractor that he should consider and rely upon the boring data and other contract information for what it may be worth and that he should not confine his investigation of the contract conditions to the contract itself." The disclaimer thus seems to have been held to reinforce the duty of site investigation.

4. *The alluvial condition and its discoverability on a minimum site examination.* The Board did not make findings in support of its decision on the effect of an alluvial condition upon the logs or on the nature of the "minimum" site examination from which the alluvial condition would have been "obvious." For these matters, the record must be consulted.

A soils engineer, one of two representatives of an engineering consulting firm who appeared as expert witnesses for the Government, testified that the river's extreme turbulence and highly erratic flood levels subjected the stream bed to erratic erosion and alluvial deposit, depending on the river's load-carrying capacity at various stages, with the result that the subsurface had become an "alluvial fan." An alluvial fan has been so stirred up as to become heterogeneous, without well-defined soil types or stratification. Its lenses or pockets are made of many different types of material. This condition, called lenticularity, existed, the witness said, throughout the subsurface of the riverbed. In a lenticular subsurface, the materials can change if "you move five feet." Stratification is negatived, extrapolation of indications for any distance from a core and even interpolation between two cores are not warranted. In such a subsurface the drill hole data in the contract could no longer be taken as indicating uniform layers of materials across the river, or as indications of the subsurface at the proposed pier sites.

The testimony of the soils engineer, interpreting the logs in the light of his knowledge of the alluvial condition, was the basis for the Board's statement that the Government's witnesses testified that "the materials described in the boring data were quite permeable—would permit the passage of as much water as was available." The implicit holding is that knowledge of the alluvial condition required interpretation of the logs as indicating alluvium.

Plaintiff's expert disputed the alluvial condition. And some doubts are raised by testimony of Government witnesses on the origins of the drill hole data attached to the contract. The holes whose logs are attached to the contract were drilled by the Bureau in 1954, two years before the contract was let. Two Bureau engineers supervised the drilling, and the junior of them made interpreta-

tions of the cores (all contract "logs" are actually interpretations of cores). Two years later, shortly before the contract was advertised in 1956, the senior engineer made other interpretations. Only these were attached to the contract. Bidders were not given or told of the earlier interpretations. The two were radically different in the materials they showed. For instance, the first interpretations showed shale and, in every hole, calcareous conglomerate, a material testified to be as permeable as any imaginable; the second set showed neither of these materials.

When the first interpretations came to light in the course of the instant proceedings, and the differences between the two became the subject of cross-examination of the soils engineer and the designer of the bridge, both witnesses testified that the earlier interpretations were erroneous. Asked to account for the errors, they said that the interpreter was unaware of the nature of the stream and the alluvial formation of the stream bed.

Whether the first interpretations were right or wrong, this testimony raises difficulties for the defense. If the first interpretations were wrong, and the alluvial condition was really unknown to a Bureau engineer assigned to supervise the drilling and interpret the core borings, surely bidders cannot be expected to learn what such a man does not know. If the interpretations were right, then their disclosure of highly permeable conglomerate should have been passed on to bidders, and the failure to do so raises "delicate and serious questions of misrepresentation or liability based on failure to disclose pertinent information." Kaiser Industries Corp. v. United States, 340 F.2d 322, 331, 169 Ct.Cl. 310, 325–326 (1965).

Turning from the alluvial condition itself to the ease of its discovery on a proper site examination, the evidence is as follows. The invitation for bids was dated April 23, 1956. Bids were due and were opened June 1, and the contract is dated June 18. The project, a 56-mile road and bridge, was located in the interior of Costa Rica. The invitation for bids said that "The project is isolated and bidders are requested to inspect the project in a group," to be "escorted over the proposed work by the District Engineer" on May 10, 1956. A Bureau circular relating to the field inspection said that a single field trip was desirable because of "limited access and absence of travel facilities," and accordingly urged that representation by each bidder "preferably be one, and limited to two." The bidders thus had at most the period between May 10 and June 1 to study the plans, compute and file their bids.

Plaintiff's representatives made one and perhaps two plan-in-hand visits to the site, where they made a visual inspection. The evidence is that they accepted the logs as to the nature of the subsurface and did not know of any alluvial condition requiring a different meaning of the logs than appeared on their face.

Three Government witnesses, the designer of the bridge and the two expert witnesses, testified as to the means by which the alluvial condition could have been discovered.

The designer of the bridge, who had supervised construction for the Bureau, testified on cross-examination that he anticipated lenses: "I didn't know for sure they existed, but I anticipated them." Also, that he felt that the core borings had given him sufficient subsurface information on which to design and locate the piers, despite the distance of the drill holes from the piers, "because of the nature of the stream with which I was thoroughly familiar." He was asked whether he thought it misleading to allow the logs to show that the subsurface would be boulders with voids filled with sand and clay, when his opinion was that there would be lenses of many different types of materials. He responded, "I think the contractors bidding on this job are intelligent people, who could go and look at the river. That is all they had to do to

determine the character of the foundation material, which was an alluvial deposit, and certainly they could see that. There was no misleading of any kind."

This seems to have been the testimony the Board had in mind in referring to testimony that the alluvial condition was fairly obvious. The testimony of the expert witnesses does not leave the impression that the discovery of the alluvial condition would have been quite so simple.

The soils engineer described generally investigations by contractors, which included, he said, visual observation of the type of material in the stream bed and the stages of the river, inquiries from local people to gather previous high watermarks and to learn the fluctuation of the river, and employment of an investigative firm of the type which performs, for contractors, borings, seismic studies and resistancy studies, and ascertains the ripperability of rocks and the location of aggregates for concrete and of sources of borrow. He said that the studies appropriate in the instant case (unspecified, but presumably those which would have led to discovery of the alluvial condition) would have cost about $6,000, and could have been completed in 10 days.

Disagreement was expressed by the Government's other expert, a bridge designer who, among other things, had been the designer and "general factotum" in the building of the Chesapeake Bay Bridge at Annapolis and the East Capitol Bridge in the District of Columbia. He testified that he would not expect a contractor to be experienced in soil mechanics or geology but to have access to people with such skills. In the short time here available, he said, the contractor could not make exploratory borings and would be forced to rely on "his inspection at the terrain, which included of course raising the different points with the people around him; natives and so forth and so on, and his own knowledge or knowledge he could obtain from people versed in the type of geology and terrain." At another point he said

that the bidder would have to base his judgment on the terrain, his inspection and his experience: "He makes up his price to cover the lack of information." The plain implication from his testimony is that the alluvial condition could not have been discovered by a bidder, without help from technicians, and certainly not before the time the bid was due.

To sum up, the testimony of neither expert, and no other evidence except that of the designer of the bridge, supports the thought that the alluvial condition would be obvious to a bidder on a mere visual inspection of the site. The evidence is that technical services by core drillers, by a trained geologist or both, would have been necessary. The two experts disagreed as to whether the bidders in this case had enough time to employ the necessary technicians.

On the whole record, my conclusion is that there is no evidence of any substance to support a finding, if a finding of fact entitled to the benefits of the Wunderlich Act was made, that an alluvial condition of the riverbed would have been apparent to bidders on a visual inspection. On the whole record, the evidence supports the finding, and it is now made, that an alluvial condition having the effect of limiting the reliability of the logs to the immediate vicinity of the drill holes was not apparent to bidders on a visual inspection of the site, and was discoverable, if at all, on the performance of studies requiring geological or other skills beyond those which can reasonably be expected from bidders and which the bidders had no reason to cause to be made. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Koppers Co. v. United States, *supra;* Sundstrand Turbo v. United States, 389 F.2d 406, 418, 182 Ct.Cl. 31, 52 (1968).

The decision of the Board is now seen as one charging plaintiff with notice of an effect on contract logs of a geological condition not discoverable on a visual inspection of the site. As such, it is erroneous as a matter of law, for it improperly enhances the duty of site in-

vestigation at the expense of the changed conditions clause and its underlying policies.

The starting point of the policy expressed in the changed conditions clause is the great risk, for bidders on construction projects, of adverse subsurface conditions: "no one can ever know with certainty what will be found during subsurface operations." Kaiser Industries Corp. v. United States, *supra*, 340 F.2d at 329, 169 Ct.Cl. at 323. Whenever dependable information on the subsurface is unavailable, bidders will make their own borings or, more likely, include in their bids a contingency element to cover the risk. Either alternative inflates the costs to the Government. The Government therefore often makes such borings and provides them for the use of the bidders, as part of a contract containing the standard changed conditions clause.

Bidders are thereby given information on which they may rely in making their bids, and are at the same time promised an equitable adjustment under the changed conditions clause, if subsurface conditions turn out to be materially different than those indicated in the logs. The two elements work together; the presence of the changed conditions clause works to reassure bidder that they may confidently rely on the logs and need not include a contingency element in their bids. Reliance is affirmatively desired by the. Government, for if bidders feel they cannot rely, they will revert to the practice of increasing their bids.

The purpose of the changed conditions clause is thus to take at least some of the gamble on subsurface conditions out of bidding. Bidders need not weigh the cost and ease of making their own borings against the risk of encountering an adverse subsurface, and they need not consider how large a contingency should be added to the bid to cover the risk. They will have no windfalls and no disasters. The Government benefits from more accurate bidding, without inflation for risks which may not eventuate. It pays for difficult subsurface work only when it is encountered and was not indicated in the logs.

All this is long-standing, deliberately adopted procurement policy, expressed in the standard mandatory changed conditions clause and enforced by the courts and the administrative authorities on many occasions. United Contractors v. United States, *supra*, 368 F.2d at 599, 177 Ct.Cl. at 168; Kaiser Industries Corp. v. United States, *supra*; Joseph Meltzer, Inc. of N. J. v. United States, 77 F.Supp. 1018, 111 Ct.Cl. 389, 481 (1948); A. S. Horner Construction Co., ASBCA No. 5334, 59–2 BCA ¶ 2321. *See* Kendall, Changed Conditions as Misrepresentation in Government Construction Contracts, *supra*, 35 Geo.Wash.L. Rev. at 979–80, 981–82; Nash, Risk Allocation in Government Contracts, 34 Geo.Wash.L.Rev. 693, 701 (1966); Nash and Cibinic, Federal Procurement Law, ch. 15 (2d ed. 1969). Faithful execution of the policy requires that the promise in the changed conditions clause not be frustrated by an expansive concept of the duty of bidders to investigate the site. That duty, if not carefully limited, could force bidders to rely on their own investigations, lessen their reliance on logs in the contract and reintroduce the practice sought to be eradicated—the computation of bids on the basis of the bidders' own investigations, with contingency elements often substituting for investigation. The changed conditions clause "makes it clear that bidders are to compute their bids, not upon the basis of their own preaward surveys or investigations, but upon the basis of what is indicated and shown in the specifications and on the drawings." A. S. Horner Constr. Co., *supra*, 59–2 BCA at p. 10,-577. The clause "should induce the bidder not to consider such contingencies" as the latent or subsurface conditions, for which the Government has assumed responsibility. Kendall, Changed Conditions as Misrepresentation in Government Construction Contracts, *supra*, 35 Geo.Wash.L.Rev. at 985. As a complement to the changed conditions clause, therefore, the standard Instructions to

Bidders, in clause 2 (text in appendix), requires bidders only to ascertain such conditions as may be "readily determined by inspection and inquiry, such as the location, accessibility and general character of the site."

Even before the time of the modern changed conditions clause, in the misrepresentation cases, the courts held that the bidders were entitled to rely on logs in the contract, despite contract clauses requiring bidders to investigate the site and decide for themselves. United States v. Atlantic Dredging Co., 253 U.S. 1, 11, 40 S.Ct. 423, 64 L.Ed. 735 (1920). "If the government wished to leave the matter open to the independent investigation of the claimants, it might easily have omitted the specification as to the character of the filling back of the dam." Hollerbach v. United States, 233 U.S. 165, 172, 34 S.Ct. 553, 556, 58 L.Ed. 898 (1914).

In the cases arising under the modern changed conditions clause, caution continues to be observed that the duty to make an inspection of the site does not negate the changed conditions clause by putting the contractor at peril to discover hidden subsurface conditions or those beyond the limits of an inspection appropriate to the time available. Farnsworth & Chambers Co. v. United States, 346 F.2d 577, 580–581, 171 Ct.Cl. 30, 35 (1965); Fehlhaber Corp. v. United States, 151 F.Supp. 817, 825, 138 Ct.Cl. 571, 584, cert. denied, 355 U.S. 877, 78 S.Ct. 141, 2 L.Ed.2d 108 (1957); Walsh Bros. v. United States, 69 F.Supp. 125, 127, 107 Ct.Cl. 627, 630, 644, (1947); Frederick Snare Corp. v. Maine-New Hampshire Interstate Bridge Authority, 41 F.Supp. 638, 645 (D.N.H.1941).

The contractor is unable to rely on contract indications of the subsurface only where relatively simple inquiries might have revealed contrary conditions. When, for instance, logs in the contract show no water, as in the instant case, he need not seek out experts who may tell him of the possibility of subsurface water. Woodcrest Constr. Co. v. United States, 408 F.2d 406, 409–411, 187 Ct. Cl. 249, 254–256 (1969), cert. denied, 398 U.S. 958, 90 S.Ct. 2164, 26 L.Ed.2d 542 (1970). Particular protection is given by the courts to the right of bidders to rely upon drill hole data in the contract, recognized to be the "most reliable and the most specific indicator" of subsurface conditions. United Contractors v. United States, supra, 368 F.2d at 598, 177 Ct.Cl. at 166–167; Woodcrest Constr. Co. v. United States, supra.

Even unmistakable contract language in which the Government seeks to disclaim responsibility for drill hole data does not lessen the right of reliance. The decisions reject, as in conflict with the changed conditions clause, a "standard mandatory clause of broad application," the variety of such disclaimers of responsibility—that the logs are not guaranteed, not representations, that the bidder is urged to draw his own conclusions. United Contractors v. United States, supra, 368 F.2d at 598, 177 Ct.Cl. at 165–166; Fehlhaber Corp. v. United States, supra, 151 F.Supp. at 825, 138 Ct.Cl. at 583–585; Kaiser Industries Corp. v. United States, supra, 340 F.2d at 329–330, 169 Ct.Cl. at 322–324; A.S. Horner Constr. Co., supra. See Kendall, Changed Conditions as Misrepresentation in Government Construction Contracts, supra, 35 Geo.Wash.L.Rev. at 985–987.

Under the foregoing principles, the plaintiff and the other bidders had the right to rely on the indications of the subsurface in logs put in the contract for their use and reliance. The Government's witnesses agreed that the logs were sufficient, if meager, for conclusions to be drawn by the designer, and the designer himself testified that he had thought them sufficient basis on which to design and locate the pier foundations. His knowledge of the alluvial condition cannot be charged to plaintiff. The duty of the bidders to investigate the site did not require them to conduct geological or other technical investigations, costly and perhaps impos-

sible in the 20 days available, from which they might have learned of an alluvial condition of the riverbed. Woodcrest Constr. Co. v. United States, *supra*. The Instructions to Bidders directed that they investigate the site to learn what was "readily determined by inspection and inquiry." Plaintiff fulfilled this duty in the visits its representatives made to the site.

Without notice of the alluvial condition or reason to doubt the logs, plaintiff and the other bidders had every reason and right to rely on the clear indications in the logs of the nature of the subsurface. It is held that the indications in the logs were unaffected by any alluvial condition, and within the meaning of the changed conditions clause indicated that stable and relatively impermeable materials would be encountered in excavating for the footings for piers 4, 5 and 6.

5. *Confirmatory indications of an impermeable subsurface permitting excavation in the dry.* The design details and directions claimed to confirm the indications of an impermeable subsurface are (1) a note on the plans attached to the contract directing that: "All concrete to be Class 'A' except in piers which shall be Class 'B.' All concrete shall be placed in the dry"; and (2) the omission from the contract documents of any provision for a concrete seal or for the class of concrete of which seals are made.

By specifying that all concrete should be standard grades, and omitting mention of a seal or of seal class concrete from the contract documents, plaintiff contends, seals were definitely excluded from the design of the bridge. The net effect, plaintiff continues, of such a direction to pour concrete in the dry, without the use of a seal, is a clear indication that the subsurface to be encountered would be sufficiently impermeable to permit the dewatering of the cofferdam by pumping, without the use of a seal. So, plaintiff concludes, it was led to believe that it could both excavate and pour in the dry, without a seal, which, as has appeared above, was impossible because of the excess water encountered.

Defendant responds, as the Board held, that the direction to pour in the dry does not mean or require that the contractor should excavate in the dry.

The plaintiff's rejoinder is that the direction to pour in the dry, without the use of a seal, signifies an ability to excavate in the dry, for these reasons: Concrete for foundations is poured, of course, following excavation. If a contractor has been able to excavate in the dry he will pour in the dry, without need for a seal. During excavation, if he will be able to pour in the dry, he will excavate in the dry. No contractor able to dewater without a seal would postpone it until pouring, and meantime excavate in the wet, especially here, where rocks were to be excavated in a 50-foot depth. (While there was testimony on the advantages in some circumstances of excavation in the wet, the Government admitted before the Board that excavation in the dry would have been easier in this project.) The prerequisite for both excavation in the dry and pouring in the dry is the ability to dewater by pumping alone, which, in turn, depends on a subsurface relatively impermeable to the inflow of water, limiting the water to an amount within the capacity of pumps. If, therefore, dewatering without a seal is possible, it can be done for both purposes, excavation and pouring in the dry. It follows that a contractor to whom it is indicated that the subsurface is sufficiently impermeable so that he will be able to pour in the dry without the use of a seal, understands that he will be able to dewater while excavating and thus excavate in the dry. In sum, a direction to pour in the dry, without a seal, necessarily means the ability to excavate in the dry, and it is immaterial that the contract did not require or direct excavation in the dry.

The pouring of the foundation concrete in the dry, which was explicitly directed, is, taken alone, not the crux of the matter. Standard concrete can be poured only in the dry. The crux is that the direction to pour in the dry was coupled with a definite exclusion of a seal and of

seal class concrete. The exclusion indicated the designer's expectation that the contractor would be able, by virtue of the nature of the subsurface, to dewater by pumping alone, without a seal, and thus that he could both excavate in the dry and pour in the dry.

In a further effort to support the Board's decision that pouring in the dry has no necessary relationship to excavation in the dry, the Government argues that "the conclusion is inescapable from the record that plaintiff excavated for piers 5 and 6 in the wet and poured its pier concrete in the dry." The statement is true enough, if overcondensed. With the added facts of the seals, it is essentially plaintiff's complaint.

At pier 5, as is recounted in the Description and Reason for Change Order No. 17, plaintiff began excavation in the dry, abandoned it when pumping could not empty the cofferdam of excessive water, continued excavation in the wet, and when the excavation reached bottom, poured the seal ordered by the change order, and only then was able to pour concrete in the dry. At pier 6, it is true enough that plaintiff excavated in the wet and poured in the dry. Again, the omitted fact of the intervening seal is all-important. Plaintiff was able to pour in the dry only after pouring a seal. The seal, a specific remedy for a subsurface so permeable that water enters beyond the ability of pumps to remove it, cannot, of course, be poured until the excavation reaches bottom. Where a seal will be necessary, excavation will perforce be done in the wet. Where a seal is unnecessary, excavation can be done in the dry. The "necessary relationship" is not between pouring in the dry and excavation in the dry, but between pouring in the dry without need for a seal and excavation in the dry. It is the direction to pour in the dry, *without need for a seal*, that means that excavation in the dry will be possible.

The Government next contends, as the Board held, that plaintiff had notice of the possibility that a seal might be added to the design, through the incorporation into the contract of item 25–3 of the specifications FP–41, mentioned in note 1. The full title of FP–41 is "Specifications for Construction of Roads and Bridges in National Forests and National Parks as revised July 15, 1941, Federal Works Agency, Public Roads Administration." (The Bureau of Public Roads is the successor of the Public Roads Administration.) Subdivision 3 (c) of Item 25–3 of FP–41 (text in appendix), the portion relied upon, provides that a seal may be ordered by the engineer in charge of a project when it is found impracticable to dewater a cofferdam without it:

(c) When conditions are encountered which render it impracticable, in his opinion, to unwater the foundation before placing masonry, the engineer may require the construction of a concrete foundation seal of such dimensions as he may consider necessary, and of such thickness as to resist any possible uplift. The concrete for such seal shall be placed as shown on the plans or as directed by the engineer. The foundation shall then be pumped out and the balance of the masonry placed in the dry. When weighted cribs are employed and the weight utilized to overcome partially the hydrostatic pressure acting against the bottom of the foundation seal, special anchorage such as by the use of dowels or keys shall be provided to transfer the entire weight of the crib into the foundation seal. When a foundation seal is placed under water, the cofferdam shall be vented or ported at low water level as directed.

FP–41 is a book of over 500 pages. Almost needless to say, it is not physically attached to the contract, and the first question concerns the incorporation of its Item 25–3.3(c) into the contract. Incorporation is said to have taken place by virtue of the provisions of the foreword to FP–41, which states that where FP–41 is cited in a contract (as it was here), it shall be binding "in its entirety," "except that such specification items as are not *cited* or *involved* in the plans,

bid schedule, special provisions, or other contract documents shall not be a part of the particular contract" (emphasis supplied).

It is not contended that Item 25-3 is "cited" in the contract, but that it is "involved" in Item 25(2) of the Bid Schedule (text in appendix), in which plaintiff bid $37.50 per cubic yard for an estimated quantity of 6,200 "Cubic Yards Unclassified Excavation for Structures (Bridges)." The theory is apparently that since plaintiff was paid for the cofferdams under Bid Item 25(2), Item 25-3.3(c) of FP-41, which deals with cofferdams, is "involved" in the bid schedule and thereby was incorporated into the contract. Once incorporated, the argument continues, Item 25-3.3(c) gave bidders such notice that seals might be added to the design if it became impracticable to dewater without them, as to prevent it being thought that seals were excluded from the design or that the contractor was directed to pour in the dry without a seal.

The contention is rejected. Passing over the difficulties of the incorporation by involvement, Item 25-3.3(c) gave the bidders notice of nothing concerning seals in this bridge or subsurface conditions at this site. It did not affect the inferences to be drawn from the specification that all concrete should be standard and be poured in the dry, from the exclusion of a seal from the design and from the omission of any mention of seal class concrete. The Item told only what every bidder and contractor knows—that "When conditions are encountered which render it impracticable," in the opinion of the Government's engineer, to dewater a cofferdam, the engineer may (by change order, the Government concedes) require the construction of a seal.

The generality of the applicability of the Item to any contract for a project involving a cofferdam, and the generality of its content—no more than a statement of the power of the supervising engineer in any case—deprive the Item of significance as an indication of sub-surface conditions at the site of a particular project, or as affecting the indications of subsurface conditions, otherwise to be gathered from the plans and specifications, at this project. United Contractors v. United States, *supra*, 368 F.2d at 598, 177 Ct.Cl. at 166–167; A. S. Horner Constr. Co., *supra*. In the last cited case the logs had indicated no water, artesian well water and a pervious bottom had been encountered, and by change order a tremie seal was poured. The Government took the position that the description of a seal and other remedies for coping with excess water, in a specification clause similar to Item 25-3.3(c) (and physically a part of the contract, as Item 25-3.3(c) was not) placed the contractor on notice to expect such water as was encountered. The Armed Services Board of Contract Appeals held that the general language of the specification did not have the effect of overcoming the specific indications in the logs that excess water would not be encountered (59–2 BCA at p. 10,-578):

> \* \* \* In our opinion those provisions are general in coverage, appearing in most contracts of this nature, having no special significance to the situation before us. These provisions are meant to cover all possible conditions and advise what should be done and how it should be done "in case" or "in the event" such water conditions are found to exist. They do not say such conditions do exist or are reasonably expected to exist. Obviously they couldn't mean that because the Government's own borings failed to disclose the presence of such water conditions.

Lastly, the Government argues, on the testimony of the designer of the bridge, that the contract did not negative seals but merely postponed the decision until the excavation showed what the conditions were. Any private view of the designer reserving judgment on seals and making the design a tentative one was not communicated to bidders. They saw only provisions and plans which in-

dicated to them, reasonably, that seals were excluded from the design, and that they could expect to encounter subsurface materials of such impermeability as would permit dewatering by pumping, without a seal. Had seals been shown, or the seal class of concrete mentioned in the invitation for bids, even as an alternate bid item, the bidders might well have increased their bids. As it was, their bids reflected their reliance on the significance of the exclusion of seals they saw in the contract.

The testimony of the designer, as summarized by the Government, is that excavation, in the dry or in the wet, is exclusively the contractor's problem, not the Bureau's; that in planning the bridge there was "some question" whether seals would be required at all, or only in piers 5 and 6, or in all piers, and he did not want at that time to spend the money seals would cost—$40,000 per seal—and show a seal in every place, when to have done so would have led the contractor not to make an effort to dry up his excavation without a seal and to pour the footings in the dry, as he did at piers 1, 2 and 3; that when it became impractical to dewater without seals, they were ordered pursuant to Item 25–3.3(c) of FP–41; and that he had followed this same procedure in omitting seals from his plans for other bridges.

This testimony shows that the designer understood his specifications just as plaintiff understood them—to indicate that the subsurface would be impermeable enough to permit dewatering by pumping, without a seal. Seals were omitted to spur the contractor to such efforts to dewater, without a seal. Plaintiff is confirmed in finding in the contract indications that it would be able to excavate in the dry.

6. *Confirmatory indications of a stable subsurface.* A contract indication claimed by plaintiff to confirm the indications, in the logs, of a stable and firm subsurface is a note on the plans reading: "Note: Foundation Material in all piers and Abut. No. 2 must be capable of resisting a footing pressure of not less than *6 tons* per sq. ft. (emphasis in original)." The Government's experts and the designer of the bridge testified that the materials described in the logs at the elevation of the footings would have a 6-ton bearing capacity. The note is reasonably to be read as saying the same thing.

The indications in the note of a stable and firm subsurface were nevertheless rejected by the Board.

In part, the Board relied on grounds, already found wanting above, having to do with the alluvial condition. The Board also relied on the opinion of the Government's expert witnesses that the bidders had notice, from Items 25–3.1(b) and 25–5.1(a) of FP–41 (text in appendix), that if unstable soils were encountered, change orders and extra work orders would direct changes in elevation and whatever other extra work would be required to achieve a well-supported foundation. This ground is essentially the same as that rejected above with respect to notice from FP–41 of the use of seals.

The 6-ton note, the Board held, was not a "guarantee or representation that such soils were or would be actually there." In this decision, the Board was applying a standard from the law of misrepresentation, inappropriate in a determination of the conditions "indicated" in a contract for purposes of a changed conditions claim.

It is held that the note confirmed the indications of a stable subsurface and that the logs and the note indicated soils of a 6-ton bearing capacity at the planned elevation of the footings.

C. *The Materiality of the Difference Between the Conditions Indicated and Encountered*

It has appeared in Part A that the plaintiff encountered, in fact, materials of high permeability and low stability, and in Part B that different materials were indicated in the contract. The materiality of the differences is borne out by the entire record, and is vividly confirmed by the nature and extent of the

changes in the design of the bridge ordered by the Bureau to meet the changed conditions.

Excess water and instability or a lack of bearing pressure were encountered in such substantial degree that at pier 4 the elevation of the footing was raised 15 feet, and 48 12″ H-shaped steel bearing piles, weighing 65 lbs. per foot, were driven underneath the footing, for a minimum distance of 20 feet, to develop a bearing pressure of at least 46 tons each. At piers 5 and 6 the footings were lifted 17 and 19 feet, respectively, and seals 35′ x 26′ 6″ by 17′ 9″ high and 34′ x 26′ x 14′ 7½″ high, respectively, were poured under the footings proper.

These changes were plainly substantial modifications of the work to meet changed conditions. The Board's conclusion to the contrary was based at least in part on its mistaken belief that the changes in elevation were slight and that the seals were nonstructural and of a relatively minor nature, serving simply to facilitate dewatering and not as a support structure. The facts are that the changes in elevation were substantial, that the seals were each the size of an average one-family house and that they were intended to provide needed bearing capacity, as well as to plug the bottom against excess water.

The force of the change orders as acknowledgments of changed conditions was denied by the Board on the ground that a change is not necessarily an acknowledgment of changed conditions. Change orders are of course not admissions of liability, but these change orders admit the facts of the conditions encountered, and make extensive changes to meet those conditions. There is a significant difference between changes ordered because of a discretionary, simple desire to change a plan, not dictated by subsurface conditions encountered, and extensive changes of the kind here made, as a matter of necessity, to meet patently unanticipated excess water and inadequate bearing capacity. No credible explanation of the changes is made or is possible other than that they were an ac-

knowledgment that changed conditions had been encountered, materially different from those expected.

There is no merit in the assertions that the plaintiff brought all the troubles on its own head by its faults and errors, and that the change orders were merely remedies for plaintiff's errors. The same witnesses for the Government who stoutly denied changed conditions and ascribed the troubles and the change orders to the plaintiff's faults, admitted that the job was a very difficult one and the contractor was competent, that in some areas "these boys worked very, very good," and that a good job was done on piers 1, 2 and 3.

The Board stated that it did not assess the fault of the contractor, and it made no findings of fault. The record would support none. General references in the Board's opinion to "indications" of "significant operating deficiencies" of the contractor are, according to transcript references offered by the Government, references to difficulties whose source was excess water and soils of low bearing pressures. Assertions by the Government or its expert witnesses that the seals would not have been required had the contractor proceeded with his excavation with greater care, or that steps might have been taken to prevent the blowout at pier 4 are without support by substantial evidence.

In the course of dealing with the very great difficulties created by excess water and low bearing pressure, remedies were proposed, criticized and counterproposed and steps were delayed, taken, failed and revised. Charges of error and fault were and still are made back and forth between contractor and Bureau. For instance, the Government's charge of inexperienced, shifting contractor personnel is met with a contention that the Government's representatives were frequently replaced. Another charge is that the contractor failed to drive the cofferdam piling sufficiently deeper than the excavation. There are no findings on the subject and the scanty evidence does not give substance to any conclusion that

deeper pilings would have availed against the pressure of the loose soils and the quantity of excessive water encountered. The charge that difficulties came from the contractor's failure to drive the piling plumb or straight, without "toe-in," is met by the defense that it was impossible to drive piles straight in loose soils which gave them no hold.

A charge that the contractor was guilty of drawing water into the excavations by excessive pumping is met by the countercharge that the Bureau urged more pumping. The charge cannot stand in the face of the great amounts of water encountered. As seen above, the intention of the designer in the specifications was to spur the contractor on in his efforts to dry up the excavations by pumping. The plaintiff charges that the Bureau did not until very late disclose the logs of the holes drilled during excavation and that knowing that seals would be necessary and excavation in the dry impossible, the Bureau stood by and waited until work was destroyed by blows and losses of cofferdams. These recriminations cannot cover over the root cause of all the troubles, the crushing force of the water and unstable soils in the subsurface.

Some specific claims of fault of the contractor, however, for example that a particular cofferdam failure was caused by inadequate bracing rather than by the changed conditions, create controversies over items of damage. The amount of the equitable adjustment remains to be determined, having been deferred to the resolution of the question of liability. In the further proceedings, particular items of claimed damage may turn out to have other causes than the changed conditions. The Government's liability for consequences of the changed conditions is, however, clear.

## II.

### The Claim of Changed Conditions at Abutment 2

The claim for changed conditions at abutment 2, on the south bank of the river, rests on the logs of drill hole 6 and on the hard shale and rock encountered in excavating. The log showed a surface layer of 4½ feet of topsoil and an underlying layer of 2½ feet of "sandy clay with few boulders, firm," conditions which are materially different from hard shale and rock. The changed conditions are claimed to have been acknowledged by a Bureau direction, when the shale and rock were encountered, to terminate excavation for the east side of the footing 6 feet above plans, at the bottom then reached in excavating.

The Board affirmed the denial of the claim by the contracting officer, who had held that the drill hole was too distant from abutment 2, that the hole was narrow and did not go as deep as the planned footing of the abutment and that bidders could have seen, on the partially exposed riverbank, interbedded layers of limestone and weathered shale similar to the materials excavated. Plaintiff's contention as to the significance of the change directed by the Bureau when the rock was discovered was rejected by the Board on the ground that since the change was authorized by Item 25–3.1(b) of FP–41 (text in appendix), it could not be construed as an acknowledgment of changed conditions.

Under the principles of law stated in Part I, the width and depth of the hole, and its distance from the planned site, are insufficient ground to withhold from the bidders the right to rely on the log of its contents. That distance, 38 feet, was substantially the same as the distance from the proposed excavation for pier 6 of the two holes drilled during construction to gain information on the subsurface at that pier, and it was much less than the distance of drill holes 2, 3 and 4 from some of piers 4, 5 and 6. As for the depth of the hole, the relationship of the elevation of the bottom of the hole to the elevation of the planned footing is less important than the relationship of the entire hole to the elevations at which rock and shale were excavated. More than half of the depth of the hole—+79.5 to +72.5—was on a

level with the rock and shale encountered, in the east excavation for abutment 2, at +76.68 to +65.72.

Drill hole 6, as distant from abutment 2 and as narrow and deep as it was, was drilled by the Bureau, with the other holes, to help determine the subsurface and fix the elevations of footings for piers and abutments. It served the designer for this purpose and its log was put in the contract for the use and reliance of the bidders. Under the principles of law discussed in Part I, the bidders had a right to rely on the data in drill hole 6 as indicators of the subsurface at abutment 2, subject to whatever information they already had or should have gathered from a proper site examination.

The last ground for the decision of the Board is that on a proper site examination, rock would have been visible on the exposed riverbank immediately surrounding the site of abutment 2. As in the case of the claim concerning piers 4, 5 and 6, the question presented for decision is one of the adjustment of the duty of site examination to the changed conditions clause.

The relevant evidence consists of the findings of the contracting officer and the testimony of their author, an engineer who had been the contracting officer in the period of the investigation of the claim and who had drafted the findings and determinations of the contracting officer rejecting plaintiff's claim. In his brief testimony, the witness referred to rock and limestone on the bank, shown by pictures in the record. He said that "The important thing is that the rock was exposed for quite some distance upstream." There are pictures in the record, in a series of exhibits whose prefix is "S," showing exposed interbedded layers of rock-like substances, on the bank. Also, the findings of the contracting officer state that the interbedded layers of limestone and weathered shale were to be seen with the naked eye at the "bridge site proper" and extended a half-mile upstream on the left bank of the river. These findings have the status of evidence relied upon by the Board,

and not of findings which are possibly entitled to finality. Cf. Dean Construction Co. v. United States, 411 F.2d 1238, 1245, 188 Ct.Cl. 62, 74–75 (1969).

Both the exposed rock and the non-rock materials in the drill hole are, however, on a level with the rock and shale encountered in excavating, between elevations 76.78 and 65.72. The exposed rock was at elevation 69.0 and downward and the topsoil and firm sandy clay in the drill hole was at elevation 72.5 and upward. Also, it does not appear whether the exposed rock was more, or less, distant, than the drill hole from the abutment site.

Doubts as to the materiality of the exposed rock are further raised by the fact that the contracting officer may have improperly given weight to the exposure of rock a half-mile distant from the bridge. The findings and determinations are based on various stated premises, among them that the Government had effectively disclaimed responsibility for the correctness of the logs; that logs of drill holes are not intrinsically reliable; that the responsibility for wrong inferences from them is the bidders'; that the bidders had the opportunity in making their bids to compensate themselves for the lack of reliable information; that they were bound to make their own investigation of the area and had by filing bids indicated their satisfaction with whatever were the subsurface conditions at the site, broadly defined. All these premises were incorrect in law. Since they were part of the basis for the conclusion that the rock was visible at the site, the conclusion is tainted, particularly so by the reliance on the visibility of rock a half-mile away from abutment 2 and the possibility that the visible rock nearest the abutment was farther away than drill hole 6.

The evidence of the visibility of the exposed rock on a proper site investigation is, therefore, deficient, and cannot overcome the right of the bidders, including plaintiff, to rely on the log of drill hole 6, attached to the contract, under the principles of law set out in Part I. The hole was drilled with the

others to provide information on the subsurface, for the purpose, among others, of determining the elevation of the footing of the abutment. It served this purpose, and the log was put in the contract as information on the subsurface materials to be encountered, for the use and reliance of bidders in computing their bids.

The change ordered by the Bureau when rock was encountered, moreover, was recognition that conditions were other than anticipated. The exposed rock was as visible to the designer as to plaintiff, and if the rock reasonably indicated rock at the abutment site, as the Government now urges, the footing elevation would have been planned to be higher. The significance of the Bureau's change in elevation cannot be dismissed on the ground that it was authorized by Item 25–3.1(b) of FP–41 (text in appendix). As with other provisions of FP–41, discussed above, this Item gave no notice of subsurface conditions, but generally reserved authority to order changes in footings.

■ The duty of site examination, properly construed, did not, therefore, charge plaintiff with such notice from the exposed rock as prevented reliance on the log of drill hole 6. It is held that the conditions indicated in the logs differed materially from those encountered, and the claim of changed conditions at abutment 2 is sustained. The amount of rock and shale encountered and the costs incurred, in excess of the costs of excavating such material as was indicated on the logs, were subjects of attention in the contracting officer's findings. These are matters for decision at the time of the determination of the appropriate equitable adjustment.

### III.

*Issues and Claims Other Than Changed Conditions*

A. *Additional Issues in the Claims for Changed Conditions*

The decision now made reverses the Board's denial of the changed conditions element in the claims numbered in its opinion 1–10. Other matters in these claims require consideration.

■ 1. In one of these claims, for placing a choker course or cover at the bottom of the excavation for pier 4 to make the cofferdam watertight, the Board summarily affirmed the denial of the claim by the contracting officer. That officer had held that the cover was not ordered, but merely suggested by the Bureau as a means of meeting the plaintiff's failure to build a watertight cofferdam. It appears in the record that the Bureau in a letter "insisted upon" the work as part of its "suggestion only," which it permitted to be carried out as a means of overcoming what it said was the contractor's "failure to obtain a satisfactory watertight cofferdam by reason of the construction methods followed."

The basic cause of the failure to obtain a watertight cofferdam was changed conditions. It is therefore irrelevant whether the choker course was suggested or directed. The claim is to be allowed as based upon changed conditions.

2. In a claim for loss of piling imbedded in the seals, the Government urges that general references in the Board's opinion to testimony of operating deficiencies of plaintiff at piers 5 and 6 constitute an alternative ground for denial of the claim. The portion of the opinion relied upon is neither specific nor stated to be a ground for the denial of a specific claim, and in any event the testimony pointed out by the Government recounts matters whose source was the excess water and unstable soils encountered.

■ 3. During the suspension of work at pier 4, plaintiff requested a delay in the shipment of the steel for the truss spans, to avoid the costs of storage and painting touch-up which would be required if the steel were exposed to Costa Rican weather while awaiting installation. The Bureau denied the request and plaintiff claimed for the extra costs of storage and paint touch-up. The Board denied the claim on the basis of its overall ruling on changed conditions.

In the course of the denial, the Board referred to the statement of a witness for plaintiff who observed that exposure of the steel on a dock in the United States would have been no different from the exposure in Costa Rica. Perhaps so, but since the delay and the need for the prolonged period of storage had their source in changed conditions, the costs of storage and exposure in either place is a compensable cost. In another comment the Board mentioned testimony and findings of the contracting officer on plaintiff's deficiencies in handling, cleaning and painting the steel. Such deficiencies go to the amount of damages. The contracting officer found that the prolonged period of storage was due primarily to cofferdam difficulties which are now being held to be the consequences of changed conditions. How much of the need for painting turns out to have been caused not by the basic delay, exposure and storage attributable to changed conditions, but by improper protective measures is an issue to be settled on the determination of the equitable adjustment.

4. Another claim, for warehousing fuel and cement, was denied by the Board together with its denial of the claim for paint touch-up and storage of steel. The Board's reference to inadequate protective measures was a reference to the steel, not the fuel and cement. The conclusion that the warehousing costs were "too remote" did not refer to any ground for denial other than the rejection of the claim for changed conditions. The determinations of the contracting officer confirm that changed conditions was the only issue involved in the claim for warehousing fuel and cement.

5. I do not read the petition as challenging the Board's denial of a claim, for the cost of certain employee benefits, based upon changed conditions and allegedly false testimony by Bureau officers, before a Costa Rican labor agency.

 6. In only one instance is there a valid alternative ground for the denial of one of the claims for consequences attributed to changed conditions. The claim is one for the costs of a temporary trestle which was built when the Bureau denied permission to build an earth ramp. The Board denied the claim on two grounds—its adverse determination on the claimed changed conditions and the absence of evidence showing that the Bureau acted beyond its discretionary powers in denying permission to build the ramp.

It appears that plaintiff had planned to provide work space by filling in a ramp between the south bank and pier 6, and contended that the Bureau's unreasonable denial of permission to build such a ramp required the building of a trestle, instead, at a greater cost. The claim is thus one for a constructive change only and has nothing to do with changed conditions. It was properly denied, for the testimony was in conflict on the propriety of the discretionary denial of permission, and plaintiff has not shown an abuse of discretion.

7. There is no need to discuss the merits of the theory of constructive change offered by plaintiff as an alternative ground for several of the subdivisions of the claims for changed conditions. One such claim is made for the costs incurred when the river's rise prevented the removal of the cofferdam piling at pier 6. The long-run cause was changed conditions and the short-run cause was a Bureau direction that the forms for the pier cap, braced against the piles, remain undisturbed for a certain number of days. The Government suggests that since the Board passed only on the ground of changed conditions and did not consider the alternative ground of constructive change, the claim should be remanded, under United States v. Anthony Grace & Sons, Inc., *supra*, for further consideration of the Board. The remand of the claim now ordered is on the different ground that Government liability for the changed conditions claims has been established.

B. *Claims for Other than Changed Conditions*

1. Plaintiff claims extra costs incurred in having driven the bearing piles

ordered at pier 4 to a greater bearing capacity than required. Change Order No. 10 directed the driving of 48 miles to a depth at which each would develop at least a 46-ton bearing pressure, with a minimum penetration of 20 feet. Records of the bearing pressure developed in each pile were kept by the Bureau. A Government exhibit at the hearing, covering 32 of the 48 piles driven, disclosed that all of them had been driven to a much greater bearing capacity than 46 tons. Over 20 were driven to bearings of at least 70 tons or more, substantially beyond the 10 percent the plaintiff concedes is a noncompensable reasonable overrun.

Plaintiff contends that while it was paid per linear foot of piles driven, the cost of driving per foot increases at higher bearings, and that it is entitled to an adjustment for the increase in its costs, over the price per foot fixed on the basis of driving to a 46-ton bearing pressure. To show the added effort involved in the overdriving, plaintiff points out that the work of driving the piles took 30 days as against the estimate in connection with the change order that a hammer would be required for 9 days and a foreman for 12 days.

The Board denied the claim for lack of proof that extra costs had been incurred. In a heterogeneous riverbed, it held, the excess capacity "might well have been achieved with little or no extra pile-driving work," by driving through materials offering little resistance. In support of the decision, the Government cites testimony by one of its expert witnesses that the differences between 46 and 100 tons may be reached in 2, 5 or 18 inches, depending on the material through which the pile is being driven.

 The decision errs, in disallowing a claim otherwise valid because of mere difficulties in proving damages. It is settled law that absolute certainty in proving damages is not necessary where it is clear that damage occurred. Petrovich v. United States, 421 F.2d 1364, 1367–1369, 190 Ct.Cl. 760, 766–769 (1970), and cases cited. Aside from difficulties in determining the costs of the extra work actually involved in achieving greater bearing in driving through materials of differing resistance, it is not disputed that the cost of driving rises as bearings increase. The price fixed per foot was a price for piles to be driven to 46-ton bearings, in a situation where additional bearing capacity was desirable to supplement the inadequate qualities of the subsurface. To allow the piles to be driven to such bearings as 80, 90 and 100 tons was to take advantage of a price fixed on the basis of a lower bearing. The Government therefore is liable for an equitable adjustment for the extra costs incurred, for it kept the record of the work done and allowed the contractor to perform work, of benefit to the project, beyond that ordered to be done. *Cf.* WRB Corporation v. United States, 183 Ct.Cl. 409, 419–424 (1968); Ross Constr. Corp. v. United States, 392 F.2d 984, 987–988, 183 Ct.Cl. 694, 700–701 (1968); W. H. Armstrong & Co. v. United States, 98 Ct.Cl. 519, 528–531 (1943); Spector, An Analysis of the Standard "Changes" Clause, 25 Fed.B.J. 177 *passim* (1965).

The difficulties in fixing the amount of the equitable adjustment are not insuperable. One method may utilize a comparison of the time estimated and the time required for the work, adjusted as necessary for the payments made per linear foot. Additional or other evidence relevant to the determination of the equitable adjustment may also be developed.

The determination should of course be based upon records for all the piles. If, as claimed, the Government kept and it failed to perform a duty to preserve the records of the driving of all 48 piles, the average of the overdriving of the piles covered by such records as were kept may be used as representative of the facts for all the piles.

2. Forms for a deck span were fabricated by the contractor in accordance with the specifications in the plans for the camber, or convexity, of the steel beams to be encased in the deck and the camber of the deck itself, designed to be slightly convex so as to flatten out when

under full load. The beams were to be spliced or riveted at the site. When plaintiff did the splicing, the staff of the Bureau's project engineer directed the removal of the blocks placed by plaintiff underneath the spliced beams, over plaintiff's protest and contrary to standard practice. As a result, the camber of the spliced beams was changed from that required by the plans, and plaintiff was required to rework the forms for each of the spans, work which had not been contemplated. Thereafter, the project engineer agreed with plaintiff's position that the engineer's staff had caused the extra work, and asked for cost records on which payment would be made for the work as an extra.

Plaintiff's case is based entirely on the brief testimony of its office manager at the site and on three letters. The first two letters, written by the subcontractor to the contractor for transmittal to the project engineer, recite the facts set out above and submit the costs of revising the forms for one span, to be multiplied by the number of spans involved, in accordance, it is said, with the subcontractor's understanding of the verbal request of a Bureau engineer. In the last letter the project engineer responds. He agrees to certain of the hours and rejects others, on the ground that they were spent on work for the convenience of the subcontractor which "was not ordered by us." Rejecting the multiplication by the number of spans of the hours spent on one span as a means of determining costs, he asks for the hours spent on revision of the forms in the other spans "in the same form as soon as yo ucan so that we can process the papers." Payment was, however, not made.

The Board held that the obligation to produce the deck as designed included all necessary adjustments of the forms to compensate for any inaccuracies in camber, and that plaintiff had not demonstrated that the work was in fact extra work beyond the contractor's obligation. Plaintiff does not deny the obligation, but claims that its procedure would have required one fabrication of forms and that when doing the work in proper fashion, it was directed to change its procedure, contrary to good practice.

■ The claim is small and the evidence not plentiful. The exchange of letters sufficiently establishes, however, that the work was extra, beyond the contractor's obligation, and was ordered as such. The contrary evidence, on which the Board relied, was the testimony of the engineer who drafted the contracting officer's determinations, to the effect that the contractor's splicing procedure was wrong. This testimony does not gain additional weight from the witnesses' assignment as division engineer at the bridge two years after the events in question, or by his position as author of the contracting officer's determinations. It is not sufficiently substantial to support the Board's decision, in the face of the written evidence, which shows that the project engineer acknowledged responsibility for the work as an extra, at a time when the facts were fresh and available to him from his staff or from his own participation in the affair. On that evidence, the claim is made out, and is therefore allowed. Koppers Co. v. United States, *supra*.

3. A last issue relates to the elements of the appropriate equitable adjustment. Before the Board, the parties were in dispute as to the proper measure of compensable overhead and profit payable in connection with several awards to plaintiff made by the contracting officer. The Board said that the issue was not ready for decision, and it directed that the parties negotiate equitable adjustments containing appropriate allowances for overhead and profit. It held, however, that plaintiff, the contractor, was not entitled to any mark-up or profit on sums allowed for the benefit of the subcontractor. Plaintiff claims this last was error. The Government concedes the error insofar as profit computed in the bid is concerned, and I do not take this to mean anything less than profit and other proper costs, if any, of the contractor itself, whether expressed in a percentage mark-up or otherwise. Matters of dam-

ages are not now presented for decision, not having been litigated and decided by the Board. The parties will now attempt to negotiate an equitable adjustment in accordance with the decisions now made, and, failing agreement, will present the matter to the Board.

### Conclusion

For the reasons stated:

1. The plaintiff's motion for summary judgment is allowed in part, defendant's cross-motion correspondingly denied, and partial summary judgment entered adjudicating that plaintiff is entitled to recover on its claims for changed conditions at piers 4, 5 and 6 and abutment 2, with the exception of the claim for the costs of a trestle, and on its claims for changes in connection with overdriving of piles at pier 4 and the reworking of the forms for the deck spans; and further proceedings are stayed pursuant to Rule 167 for a period of ninety days to afford the parties an opportunity to obtain an administrative resolution of the amount of the equitable adjustment to which plaintiff is entitled.

2. The plaintiff is not entitled to recover on the other claims asserted in the petition, as to which the defendant's cross-motion is allowed, plaintiff's motion correspondingly denied, and the petition is dismissed.

### APPENDIX

I. GENERAL PROVISIONS (Construction Contracts), Standard Form 23 A, March 1953, Prescribed By General Services Administration, General Regulation No. 13:

#### 4. CHANGED CONDITIONS

The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do so materially differ and cause an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made and the contract modified in writing accordingly. Any claim of the Contractor for adjustment hereunder shall not be allowed unless he has given notice as above required; provided that the Contracting Officer may, if he determines the facts so justify, consider and adjust any such claim asserted before the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Clause 6 hereof.

II. Specifications For CONSTRUCTION OF ROADS AND BRIDGES IN NATIONAL FORESTS and NATIONAL PARKS, as revised July 15, 1941, FEDERAL WORKS AGENCY, PUBLIC ROADS ADMINISTRATION. (This publication may be designated as FP–41) United States Government Printing Office, Washington: 1948:

### FOREWORD

This book, Specifications for Construction of Roads and Bridges in National Forests and National Parks, contains a collection of specification items. Some items are preferred and others are designed to meet local conditions and needs. This book does not contain items covering bituminous pavements, classes H, I, or J, nor items covering portland cement concrete base or pavement.

This book, cited in the contract (Form 23) under article 1 thereof, is a contract document and shall be binding in its entirety upon the parties signatory

to the contract, except that such specification items as are not cited or involved in the plans, bid schedule, special provisions, or other contract documents shall not be a part of the particular contract, and except that anything contained herein which is modified by, or is in conflict with, any supplemental specifications or any special provisions identified as part of the contract under said article 1 of Form 23, shall not be binding for the particular contract.

This book includes an article on patents, an article on liquidated damages, articles construing matters applicable under articles 3 and 4 of Form 23, an article providing certain administrative procedures for partial payments and certain clauses mutually agreed upon covering administrative procedures necessary in applying articles 2, 3, 4, 5, and 15 of Form 23 to the various contingencies encountered.

\* \* \* \* \* \*

## DIVISION I.—GENERAL REQUIREMENTS AND COVENANTS

\* \* \* \* \* \*

Art. 2.3 EXAMINATION OF PLANS, SPECIFICATIONS, AND SITE OF WORK.—Pursuant to the requirement of article 1 of Form 22, the bidder is required to examine carefully the site of the project contemplated, and the bid form, bid schedule, plans, specifications, and contract form prepared for the project contemplated. It is mutually agreed that submission of a bid shall be considered prima facie evidence that the bidder has made such examination and is satisfied as to the conditions to be encountered in performing the work as scheduled, or as at any time altered without resulting in increases or decreases of more than the percentage limits hereinafter stipulated, and as to the character, quality, and quantities of work to be performed and material to be furnished, including said contingent increases and decreases, and as to the requirements of the specifications, supplemental specifications, special provisions, and contract.

\* \* \* \* \* \*

Art. 4.2 SUBSURFACE AND /OR LATENT CONDITIONS AT THE SITE.—(a) It is mutually agreed that the words "subsurface and/or latent conditions at the site," as used in article 4 of Form 23 shall be construed to mean and to refer solely to conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications.

\* \* \* \* \* \*

## DIVISION II.—CONSTRUCTION DETAILS

\* \* \* \* \* \*

## Item 25.—UNCLASSIFIED EXCAVATION FOR STRUCTURES

\* \* \* \* \* \*

### CONSTRUCTION METHODS

25–3.1 EXCAVATION.—(a) The contractor shall notify the engineer a sufficient time in advance of the beginning of excavation for structures, so that cross-sectional elevations and measurements may be taken of the undisturbed ground. The natural ground adjacent to the structure shall not be disturbed without permission of the engineer.

(b) Trenches or foundation pits for structures or structure footings shall be excavated to the lines and grades or elevations shown on the plans or as staked by the engineer. They shall be of sufficient size to permit the placing of the full width and length of structure or structure footings shown. The elevations of the bottoms of footings, as shown on the plans, shall be considered as approximate only and the engineer may order, in writing, such changes in dimensions or elevations of footings as may be deemed necessary to secure a satisfactory foundation.

(c) Boulders, logs, or any other objectionable material encountered in excavation shall be removed. All rock or other hard foundation material shall be cleaned

of all loose material and cut to a firm surface, either level, stepped, or serrated, as directed by the engineer. All seams or crevices shall be cleaned out and grouted. All loose and disintegrated rock and thin strata shall be removed. When masonry is to rest on a surface other than rock, special care shall be taken not to disturb the bottom of the excavation, and excavation to final grade shall not be made until just before the masonry is to be placed, except as hereinafter provided under FOUNDATION FILL. Where foundation piles are used, the excavation of each pit shall be completed before the piles are driven. After the driving is completed all loose and displaced material shall be removed, leaving a smooth solid bed to receive the masonry.

(d) Where pipe culverts are to be placed in trenches excavated in embankments, the excavation of each trench shall be performed after the embankment has been constructed to a plane parallel to the proposed profile grade and to such height above the bottom of the pipe as is shown on the plans or required by the engineer.

\* \* \* \* \* \*

25–3.3 COFFERDAMS.—(a) Suitable and practically watertight cofferdams shall be used wherever water-bearing strata are encountered above the elevation of the bottom of the excavation. Upon request the contractor shall submit drawings showing his proposed method of cofferdam construction and other pertinent features not shown in detail on the plans. Such drawings shall be approved by the engineer before construction is started, but such approval shall not operate to relieve the contractor of any of his responsibility under the contract for the successful completion of the improvement.

(b) Cofferdams or cribs for foundation construction shall, in general, be carried well below the bottoms of the footings and shall be well braced and as nearly watertight as practicable. In general, the interior dimensions of cofferdams shall be such as to give sufficient clearance for the construction of forms and the inspection of their exteriors, and to permit pumping outside of the forms. Cofferdams or cribs which are tilted or moved laterally during the process of sinking shall be righted or enlarged so as to provide the necessary clearance and this shall be at the expense of the contractor.

(c) When conditions are encountered which render it impracticable, in his opinion, to unwater the foundation before placing masonry, the engineer may require the construction of a concrete foundation seal of such dimensions as he may consider necessary, and of such thickness as to resist any possible uplift. The concrete for such seal shall be placed as shown on the plans or as directed by the engineer. The foundation shall then be pumped out and the balance of the masonry placed in the dry. When weighted cribs are employed and the weight utilized to overcome partially the hydrostatic pressure acting against the bottom of the foundation seal, special anchorage such as by the use of dowels or keys shall be provided to transfer the entire weight of the crib into the foundation seal. When a foundation seal is placed under water the cofferdam shall be vented or ported at low water level as directed.

(d) Cofferdams shall be constructed so as to protect green concrete against damage from sudden rising of the stream and to prevent damage to the foundation by erosion. No timber or bracing shall be left in cofferdams or cribs in such a way as to extend into substructure masonry, without written permission from the engineer.

(e) Any pumping from the interior of any foundation enclosure that may be permitted shall be done in such a manner as to preclude the possibility of any portion of the concrete materials being carried away. No pumping will be permitted during the placing of concrete, or for a period of at least 24 hours thereafter, unless it is done from a suitable sump separated from the concrete work by a watertight wall. Pumping to unwater a sealed cofferdam shall not commence un-

til the seal has set sufficiently to withstand the hydrostatic pressure.

(f) Unless otherwise provided, cofferdams or cribs with all sheeting and bracing involved therewith shall be removed by the contractor after the completion of the substructure. Removal shall be effected in such manner as not to disturb or mar finished masonry.

\* \* \* \* \* \*

## BASIS OF PAYMENT

25–5.1 The yardage, measured as provided above, shall be paid for at the contract unit price per cubic yard for "Unclassfied Excavation for Structures," which price and payment shall constitute full compensation for (a), b), (c), and (d) below, and for all labor, equipment, tools, and incidentals necessary to complete the item save the several exceptions as stated, and except for concrete in any concrete foundation seal. Such concrete shall be measured and paid for under CONCRETE.

(a) The forming and compacting of embankments except as otherwise provided under EMBANKMENT, the excavating and hauling except for overhaul, and (in the case of bridges and walls) except for any excavation for footings ordered at a depth more than 5 feet below the lowest elevation for such footings shown on the original plans on which the contract was awarded. Such excavation below such 5-foot limit shall be paid for in the manner prescribed in articles 9.4 or 9.5.

(b) The bedding and backfilling for culverts and the backfilling for structures other than pipe culverts, any "imperfect trench" backfilling required by the plans, and the disposing of surplus structures and materials.

(c) The preparing and completing of subgrade and shoulders, any conserving of cushion and topping material, the finishing, rounding, and warping of slopes and the construction of any cofferdams or temporary cribs.

(d) The clearing and grubbing of any description necessary to the completion of this item or of other contract items subsidiary to it, the disposing and burning of the resulting spoils, except any such work performed as ordered within areas shown, located and bounded on the plans for CLEARING AND GRUBBING, and except any clearing as defined under RANDOM CLEARING, or any grubbing as defined under RANDOM GRUBBING, when the respective item is called for in the bid schedule.

## III. SPECIAL PROVISIONS:

## REVISIONS OF FP–41 SPECIFICATIONS Covering General Requirements and Covenants

*Foreword.* In the second paragraph the words "under article 1 thereof," and "article 1 of," are hereby deleted.

\* \* \* \* \* \*

*Art. 2.3 Examination of Plans, Specifications, and Site of Work.* The words "Pursuant to the requirement of article 1 of Form 22" are hereby deleted.

\* \* \* \* \* \*

*Art. 4.2 Subsurface and/or Latent Conditions at the Site.* This article is revised to read as follows:

*Art. 4.2 Subsurface or Latent Physical Conditions.* (a) It is mutually agreed that the words "subsurface or latent physical conditions at the site," as used in clause 4 of Form 23A, shall be construed to mean and to refer solely to conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications.

## IV. BID SCHEDULE:

Bidders Please Note: Before Preparing the Proposal Read Carefully "Invitation for Bids" and "Instructions to Bidders."

\* \* \* \* \* \*

| Item No. | Estimated quantity | Pay names with unit bid price written in words | Unit bid price | Amount bid |
|---|---|---|---|---|
| 25(2) | 6,200 | Cubic Yards Unclassified Excavation for Structures (Bridges) at Thirty-Seven Dollars and fifty cents per Cubic Yard. | 37.50 | 232,500.00 |

\* \* \* \* \* \*

V. INSTRUCTIONS TO BIDDERS (Construction Contracts), Standard Form 22, Revised March 1953, General Services Administration, General Regulation No. 13:

2. *Conditions at Site of Work.* Bidders should visit the site to ascertain pertinent local conditions readily determined by inspection and inquiry, such as the location, accessibility and general character of the site, labor conditions, the character and extent of existing work within or adjacent thereto, and any other work being performed thereon. ·