(No. 91-CC-3047– 

THOS. M. MADDEN CO., Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed January 23, 1996.*
*Order filed May 7, 1996.*

MCNEELA & GRIFFIN, LTD. (PAUL A. BROCKSMITH, of counsel), for Claimant.

JIM RYAN, Attorney General (SEBASTIAN DANZIGER, Assistant Attorney General, of counsel), for Respondent.

## OPINION

EPSTEIN, J.

This is a contractor's claim against the Illinois Department of Transportation ("IDOT") for $73,352.15 of alleged additional work ordered by IDOT on a 1989 construction contract. This case arises out of IDOT contract no. 80340 for the construction of a double box culvert and removal of the old two-span concrete bridge on Illinois Route 47 over Rob Roy Creek (the "creek") at U.S.

Route 30 in Kane County, Illinois (original contract price $756,254.41).

The Claimant, Thos. J. Madden Co. ("Madden"), was hired by IDOT to build a new bridge over an old creek. The construction required diversion of the creek around the work site. To everyone's great surprise, however, the creek diversion caused water to back up underground into the surrounding farm fields through drainage tiles located under those fields. Both IDOT and the contractor were blissfully unaware of the tiles until angry farmers complained that they could not plant their mysteriously wet fields. In response to the angry neighboring farmers' complaints, IDOT ordered additional "dewatering" or diversion of the creek flow to reduce the water level to an altitude lower than that of the farmers' fields (specifically, below elevation 651.0). The issue in this case is who pays the $73,000+ cost of the "additional" diversion.

## Procedural Posture of this Claim

Thos. M. Madden Co. ("Claimant" or "Madden") filed a one count complaint, sounding in contract, claiming $73,352.15 of additional compensation for the equipment, labor and miscellaneous costs of the "additional" dewatering work ordered by IDOT. The Respondent did not answer, which our rules permit, but filed its Departmental Report as allowed under our rules and later amended that report. The Claimant moved for summary judgment and the Respondent tardily moved to dismiss the claim for failure to state a cause of action, asserting that the contract failed to provide a basis for Claimant to recover.

Because both parties' motions squarely contend that this claim is determinable on the face of the contract and the pleaded facts, and because both parties maintain that the relevant contract provisions are unambiguous and

only require interpretation and application to the undisputed facts, we directed, without objection, that the motions would be treated as cross-motions for summary judgment. (order of May 24, 1995.)

## Contentions of the Parties

The Claimant, Madden, contends in essence that it had already met its dewatering and creek diversion duties under the contract terms when IDOT ordered the additional dewatering and that the added work was not required by any provision of the contract and is an "extra" that is separately compensable under the additional work provisions. Alternatively, Madden contends the unknown subsurface drainage problem was a changed condition that warrants additional compensation. Madden maintains that neither party in fact knew about the underground tiles in the area, that in any case it was IDOT's responsibility to inform the contract bidders of any such condition, and that as a bidder and contractor it was unable to determine the existence of the tiles in off-site areas beforehand because drainage tiles are not of record and because contractors lack access to private offsite properties and therefore cannot make inspections or subsurface tests.

The Respondent disputes Madden's claim in its entirety, contending that the additional dewatering was the contractor's responsibility under the original contract terms and was within the scope of the contracted work. Respondent urges that the contractor is responsible for hidden underground conditions as well as avoidance of damage to private property under express contract terms, and was obliged by the contract to inspect the adjacent areas as well as the contract site. IDOT disputes the applicability of the "changed condition" clause. IDOT concedes that both parties were in fact unaware of the existence of the underground drain tiles, but claims that such tiles are

commonplace in certain areas of Illinois and contends that this is sufficient to put the contractor on notice.

## The Contract Issues

The interpretation issues presented concern the *application* of contract language to an unexpected circumstance—the presence of underground drainage tiles in areas adjacent to the construction site—in this construction job. It is undisputed that neither IDOT nor Madden actually knew beforehand that the subsurface drain tiles were there. Neither side contends that the off-site water backup was caused by subsurface conditions on the site itself. Both parties concede that underground drain tiles are commonplace in some areas of the State, at least in farm areas with certain soil conditions. A question of some precedential significance, therefore, is presented by this issue of who bears the responsibility for unknown underground tiles in IDOT construction projects under IDOT's standard specifications for road and bridge construction ("Standard Specifications") which are part of most if not all IDOT construction contracts.

Of course, in construing this or any construction contract, it is axiomatic that the specific contract provisions directed at the particular project ordinarily take precedence, as a matter of interpretation, over the standard specifications, which are general provisions by their nature, to the extent that the two may be inconsistent or in conflict. However, it is also true that the law of interpretation of contracts mandates that provisions be reconciled insofar as possible and practicable, so that findings of conflicts are minimized. We are also mindful, especially in cases of complex government construction jobs, that the language of the contracts is almost always drafted by the State and is almost always written in terminology and style comporting with the standard conditions.

The primary contract provisions on which the Claimant relies, are as follows:

"It shall be the responsibility of the Contractor to divert the stream flow during construction in order to keep the construction areas free of water. The method of water diversion shall be subject to the approval of the Engineer and the cost shall be included in the unit bid price * * *." Culvert Details, specifications sheet no. 2 of 8 sheets.

"9. The undersigned further agrees that the Engineer may at any time during the progress of work covered by this contract order other work or materials incidental thereto and that all such work and materials as do not appear in the proposal or contract as a specific item accompanied by a unit price, and which are not included under the bid price for other items in the contract, shall be performed as extra work, and that he will accept full compensation therefor as provided in the specifications." Madden Bid Proposal (on IDOT prescribed form).

The primary contract provisions on which the Respondent relies, all of which are provisions of the standard specifications, are as follows:

"502.01 *Description*. This work shall consist of the excavation required for the construction of all structures including all bailing, draining, pumping, sheeting; the construction of cofferdams, or temporary cribs if found necessary, and their subsequent removal; the disposal of all material obtained from such excavation; and backfiling to the level of the ground surface as it existed before any excavation was made by the Contractor.

* * *

102.05 *Examination of Plans, Specifications, Special provisions and Site of Work*. The prospective bidder shall, before submitting a bid, carefully examine the proposal form, plans, Specifications, Special Provisions and form of contract and bond. The bidder shall inspect in detail the site of the proposed work and be familiar with all the local conditions affecting the contract and the detailed requirements of construction. If his/her bid is accepted, the bidder will be responsible for all errors in the proposal resulting from his/her failure or neglect to comply with these instructions. The Department will, in no case, be responsible for any change in anticipated profits resulting from such failure or neglect.

When the plans or Special Provisions include information pertaining to subsurface exploration; borings, test pits and other preliminary investigation, such information represents only the best knowledge of the Department as to the location, character or quantity of the materials encountered and is only included for the convenience of the bidder. The Department assumes no responsibility whatever in respect to the sufficiency or accuracy of the information, and there is no guaranty, either expressed or implied, that the conditions indicated are representative of those existing throughout the work, or that unanticipated developments may not occur. All soil information upon

which the design was prepared is available for examination by all prospective bidders * * *.

* * *

107.19 *Protection and Restoration of Property.* If corporate or private property interferes with the work, the Contractor shall notify, in writing, the owners of such property, advising them of the nature of the interference and shall arrange to cooperate with them for the protection or disposition of such property. The Contractor shall furnish the Engineer with copies of such notifications and with copies of any agreements between the Contractor and the property owners concerning such protection or disposition.

The Contractor shall take all necessary precautions for the protection of corporate or private property, such as walls and foundations of buildings, vaults, underground structures of public utilities, underground drainage facilities, overhead structures of public utilities, trees, shrubbery, crops and fences contiguous to the work, of which the contract does not provide for removal. The Contractor shall protect and carefully preserve all official survey monuments * * * or other similar monuments * * *.

The Contractor shall be responsible for the damage or destruction of property of any character resulting from neglect, misconduct, or omission in his/her manner or method of execution or nonexecution of the work, or caused by defective work or the use of unsatisfactory materials, and such responsibility shall not be released until the work shall have been completed and accepted and the requirements of the Specifications complied with.

Whenever public or private property is so damaged or destroyed, the Contractor shall, at his/her own expense, restore such property to a condition equal to that existing before such damage or injury was done by repairing, rebuilding or replacing it as may be directed, or the Contractor shall otherwise make good such damage or destruction in an acceptable manner * * *.

* * *

The cost of all materials required and all labor necessary to comply with the above Provisions will not be paid for separately, but shall be considered as incidental to the contract."

## Discussion

This contract dispute presents two predicates of liability for our consideration. First is the Claimant's argument that the additional dewatering work is a simple extra outside the scope of the original contract work (i.e., the dewatering specified in the contract), but within the scope of the "additional payment" provision of the contract (section 9 of the bid). Second is the contractor's alternative theory that the unknown underground drain tiles constituted a changed condition within the scope of

article 104.04 of the standard provision. The parties' arguments all fall within these two theories.

The contractor's argument about its inability to ascertain the existence of the subsurface tiles—because they are not of record and are located on private property to which bidders and IDOT itself normally lack access for onsite inspection—relates to the changed condition theory of the case. Similarly, two of IDOT's contentions similarly relate to the changed condition analysis and its allocation of responsibility for undisclosed or unknown conditions affecting performance of the contract: the article 102.05 duty of the contractor to inspect the site and be informed about the local conditions; and the article 102.05 provision making the bidder responsible for errors in his bid.

Similarly, IDOT's arguments about the contractor's article 107.19 contract duty to avoid damage to property and its article 502.01 contract duty to drain and pump excavation sites both relate to the issue of whether the "additional" pumping ordered by IDOT was within the scope of the contracted work.

Having sorted out the issues, it becomes clear that the two issues presented are alternative theories factually as well as legally, and that the threshold question for our determination is the scope of work dispute. This is because the two legal theories have fundamentally different and inconsistent factual predicates.

The "extra" work theory is based on the factual/contractual premise that the additional disputed work, and thus the additional disputed compensation, was *not* the responsibility of the contractor under the original contract. In such event, the disputed work became a duty only because of a supplemental work order which in effect became an amendment to the contract that was previously

contemplated and authorized by the parties in their original contract. Where that is the case (i.e., if the additional work is found to be supplemental to the contract-specified work) then the dispute is resolved by straightforward application of the payment provisions to the additional work. In that circumstance, the "changed condition" analysis does not apply, because the "additional" work is an add-on that was not covered by the terms of the original contract at the time it was bid or let.

On the other hand, where the disputed work is within the scope of the original contract, the "changed condition" analysis is applicable—under the contractual changed conditions clause—as the primary contract term that governs unknown conditions and similar surprises. The changed condition analysis pertains to the conditions and circumstances that affect the performance of the contracted work. The court must emphasize, however, that contrary to the Respondent's arguments in this case, it is well settled that there are *two* (not one) kinds of changed conditions, as we recently analyzed in our opinion in *Fru-Con Corp. v. State* (1996), no. 86-CC-0870, scheduled for publication in 49 Ill. Ct. Cl.

"The standard specifications contained articles which are commonly referred to as changed conditions provisions. Article 104.04 recognizes two classes of changed conditions. The first type of changed condition is a subsurface or latent physical condition which differs materially from that which is indicated by the contract documents. The second type of changed condition occurs where the contractor encounters a subsurface or latent physical condition which differs materially from that which is ordinarily encountered and generally recognized as inherent in the work of the character provided for in the contract documents."

Changed conditions provisions typically allocate the risks of unknown conditions and are especially important when encountering, as here, unknown and possibly unknowable subsurface conditions and structures. The competing considerations are important both in individual cases, and in the general case, because the allocation of

risk for unknowns as between the contractor and the State affects the bid price of all projects let by the State:

> "The starting point of the policy expressed in the changed conditions clause is the great risk, for bidders on construction projects, of adverse subsurface conditions: 'no one can ever know with certainty what will be found during subsurface operations.' *Kaiser Indus. Corp. v. United States, supra,* 340 F. 2d at 329, 169 Ct. Cl. at 323. Whenever dependable information on the subsurface is unavailable, bidders will make their own borings or, more likely, include in their bids a contingency element to cover the risk. Either alternative inflates the costs to the Government. The Government therefore often makes such borings and provides them for the use of the bidders, as part of a contract containing the standard changed conditions clause.

> Bidders are thereby given information on which they may rely in making their bids, and are at the same time promised an equitable adjustment under the changed conditions clause, if subsurface conditions turn out to be materially different than those indicated * * *. The two elements work together; the presence of the changed conditions clause works to reassure bidders that they may confidently rely on the logs and need not include a contingency element in their bids. Reliance is affirmatively desired by the Government, for if bidders feel they cannot rely, they will revert to the practice of increasing their bids.

> The purpose of the changed conditions clause is thus to take at least some of the gamble on subsurface conditions out of bidding. Bidders need not weigh the cost and ease of making their own borings against the risk of encountering an adverse subsurface, and they need not consider how large a contingency should be added to the bid to cover the risk. They will have no windfalls and no disasters. The Government benefits from more accurate bidding, without inflation for difficult subsurface work only when it is encountered and was not indicated * * *." *Foster Const. C.A. & Williams Bros. Co. v. United States* (1970), 435 F.2d 873, 887 (U.S. Ct. Cl.).

We thus turn to the analysis of whether the "additional" dewatering work was, or was not, within the scope of the work of the original contract. Madden cites the dewatering language of the contract (quoted in full above), and emphasizes that it was required to, and did, submit a specific dewatering plan that the IDOT engineers approved, and claims that this satisfied its dewatering and creek diversion obligations under the original contract.

The Respondent contends, initially, that Madden was required "to divert the flow of the creek during construction to prevent water from invading the construction

area" and that this diversion was "intended * * * to be included in the contractor's price." Respondent emphasizes that the standard specification for excavation, article 502.01, makes it clear that Madden had the duty to perform all pumping and draining "necessary for the satisfactory completion of the project." Secondarily, the Respondent contends that the contractor's duty to avoid damage to private property under article 107.19, which specifically includes "crops," imposed a duty on Madden to effect sufficient diversion of the creek to avoid the situation that, in fact, occurred.

On the first component of the analysis, which turns on the contract specifications of the dewatering/diversion work, we find that Madden clearly had the duty to perform such dewatering of the site as was necessary "in order to keep the *construction areas* free of water" (emphasis added) and nothing more. Madden was *not* contractually bound to meet any other standard of performance and its contract obligation was *not* with reference to any area beyond the construction site itself.

Article 502.01, cited by the Respondent, is immaterial: it adds nothing to the analysis, as it is purely descriptive and sets forth no performance standards whatsoever. The fact that IDOT approved a specific dewatering plan that contemplated a particular flow diversion that was less than a 100% diversion of the creek is just icing on this particular cake. IDOT could have, but did not, specify a dewatering standard in its contract specifications—which could have been a water-flow standard or a percentage of the creek flow standard or, as IDOT finally chose in its supplemental work order, an elevation standard. But having elected not to impose a specific standard on this dewatering work, and having failed to show or even to contend that the contractor failed to meet the only standard

identifiable in this contract—the "dry construction site" standard—IDOT cannot now claim that the contract terms required more work than Madden performed with its own approval.

The second component of the scope of work analysis is a closer question. Article 107.19 of the standard specifications, imposing a duty to protect private property, including crops, that are "contiguous to the work," which the Respondent cites to us, is plainly an imposition of an important duty on IDOT construction contractors and is clearly germane here. However, we are not persuaded that this provision is broad enough or strong enough to reach the facts presented in this case, for several reasons.

First, the private property that was here affected by the contractor's performance was not merely contiguous to the work site, but extended considerable distances from the creek and bridge; this "contiguous" property language is simply not aimed at, and does not encompass, non-adjacent drainage problems as are involved in this case. Second, a reading of the entire article 107.09 indicates that its focus is on physical damage due to movement or alteration of structures and ground. Although the language is broad enough to encompass water damage caused by construction activities, the language is just not broad enough or specific enough to reach the kind of underground drainage problems that are not specific to the construction site. Indeed, if this language were construed to reach drainage problems on non-adjacent properties, it would impose a substantial and unpredictable risk on every contractor in every urbanized or suburbanized area of the State—where water delivery and drainage systems are always present—and in every rural project where a local water source is present. Imposition of such far-reaching risks without specific language mandating them is not

our province. We find no such language in any of IDOT's standard specifications to which we have been directed.

IDOT is free to alter its standard specifications to impose such extensive drainage responsibilities on its contractors, if it chooses, notwithstanding Madden's protest that it—like all bidders and contractors—lacks the knowledge and the access to obtain the knowledge of underground conditions on off-site properties from which it could calculate a reasonable risk-cost to include in its bid. That is a policy decision for IDOT to make. We find, however, that the current provision at issue here just does not reach or encompass the kind of drainage backup problem on adjacent and non-adjacent farmlands as occurred in this case. Accordingly, we again find that the "additional" dewatering work directed by IDOT was not work that was required under the terms of the original contract.

## Conclusion

For these reasons, we find that the additional dewatering work directed by IDOT was a contract addition under the terms of the original contract, and that the Claimant is entitled to additional compensation for its additional performance.

Given this finding, and in accordance with our analysis above, there is no need to decide the alternative "changed condition" theory of liability. We observe, in passing, however, that the applicability of the changed condition doctrine is at least seemingly inapplicable to this claim, as neither party has even alleged that the subsurface drainage "condition" had any impact on the performance of the construction work, and in light of our rejection of the contention that the contractor was contractually responsible for these off-site property damages.

Although the Respondent has not disputed the damages claimed by the Claimant in its summary judgment motion, the focus of the parties' motions has been on the liability issue, and we are reluctant to foreclose the Respondent or to remit it to a petition for rehearing on the damages issue, particularly in light of the parties' failure to advise the Court as to the status of the appropriation from which this project was to be paid, and in light of the Claimant's request for pre-judgment interest which has not been addressed by either party. We are unable now to determine if we can enter judgment on this claim.

The Court grants partial summary judgment to the Claimant on the issue of liability.

The Respondent is directed to file a supplementary submission setting forth (a) any legal or factual objections to the Claimant's claim of $73,352.15 in contract damages and (b) any legal objections to Claimant's request for pre-judgment interest, and (c) a report on the status of the appropriations relevant to this claim, within 28 days of the entry of this opinion and order.

The Claimant may file a reply to the Respondent's supplemental submission within 21 days after it is filed and served on Claimant's counsel.

The Court will enter an appropriate award or judgment upon receipt of the foregoing submissions.

## ORDER

EPSTEIN, J.

On January 23, 1996, this Court issued an opinion in this case granting summary judgment as to liability on this claim. The Court did not make an award, but granted the Respondent time to submit any objections to Claimant's damages and pre-judgment interest claims, and directed

the Respondent to report on the status of the appropriations germane to this claim so that an appropriate award might be made if lapsed appropriations authority in fact would support an award. The State has not complied with our order, and has failed to file anything in response to our directive. The Claimant, understandably, has not filed further pleadings.

Because we are not advised as to the status of the appropriations and lapses, the Court cannot make an award on this claim. However, we will not allow this claim on a 1989 IDOT construction contract, having been adjudicated in favor of the Claimant, to go unpaid because of the State's unresponsiveness. Accordingly, on our own motion, it is hereby ordered:

1. Claimant's demand for pre-judgment interest is denied;

2. Claimant's actual damages are found to be $73,352.15; and

3. No award is made solely due to the uncertainty of the existence of proper supporting lapsed appropriations to IDOT; and

4. It is recommended that the General Assembly appropriate the sum of $73,352.15 to Claimant, Thos. M. Madden Co. as full and complete compensation for its claim herein.